**INTERNATIONAL LONGSHOREMEN'S ASS'N et al. v. GRAHAM et al.**

No. 3875.

Court of Civil Appeals of Texas. Beaumont.

Nov. 4, 1943.

Armstrong, Cranford, Barker & Bedford, of Galveston, W. T. McNeill, of Beaumont, and Sewell Myer, of Houston, for appellants.

Renfro & Keen, of Beaumont, for appellees.

COMBS, Justice.

Appellees, Frank Graham and twenty-four other former members of Beaumont Local No. 909, International Longshoremen's Association, as plaintiffs, brought this suit against Local No. 1610, International Longshoremen's Association, and W. R. Mayo, E. D. Dyson, W. H. Farley and W. J. Bean, for damages on the theory that they had been wrongfully, and as a result of a conspiracy, expelled from membership from the Longshoremen's Association and their opportunity for obtaining and retaining employment as longshoremen thereby destroyed. Their theory was that as the result of the malicious conspiracy to get rid of them the individual defendants, appellants here, conspired together and in violation of the bylaws of Local 909, and of the Constitution and laws of the International Longshoremen's Association, caused the charter of Local 909 to be revoked by the parent organization and a charter issued for a new local, appellant Local 1610, to twenty-five former members of Local 909, thereby excluding the plaintiffs by leaving them without membership in any local. The trial was lengthy, the evidence covering some five volumes of the statement of facts. The jury found in response to numerous special issues in substance that the individual defendants did unlawfully conspire together to secure the revocation of charter of Local 909 and to take from them and operate for their own purposes the succeeding Local 1610, with the intent to deprive plaintiffs of membership in Local 909; that no just cause existed for the parent organization to revoke the charter of Local 909 as was done; that plaintiffs were denied the hearings provided by the Constitution and bylaws of the I. L. A. The jury also found various sums as damages in the form of wages lost by the various plaintiffs. Upon the jury's verdict the trial court entered judgment for the plaintiffs for the several sums so found and against the defendants, appellants here, the aggregate amount of the judgment being approximately $25,000. The judgment also decreed that plaintiffs "are members in good standing of said Local 909 and/or 1610, and of the International Longshoremen's Association," provided they pay all dues owed by them within six months after final judgment.

### Opinion.

There is a rather large record in this case. The statement of facts consists of

five volumes and the case has been extensively briefed on both sides. The evidence, pro and con, is fully set out in the briefs. We shall make a brief statement of the facts below in connection with the propositions discussed.

We shall proceed at once to a consideration of the two questions which we believe are decisive of this case. They are: (1) Under the evidence as we view it the charter of Local 909 was revoked and a new local chartered as Local 1610, in substantial conformance to the laws and customary usages of the International Longshoremen's Association. (2) On the evidence as developed we think no other conclusion can be reasonably reached than that the charter of the old union was revoked and the new local charter granted in good faith and with probable cause to believe that such action was justified. We shall discuss these two points· briefly in the order stated.

The plaintiffs, appellees here, were all members of Local 909. That local had no bylaws. The power to grant charters of locals and to revoke them rests with the parent organization, the International Longshoremen's Association. Its Constitution and bylaws, which were placed in evidence, are too lengthy to set out extensively in this opinion. Briefly, they provide, among other things, that "The powers of this International Association shall be executive, legislative and judicial and shall have full and final jurisdiction over all locals * * * It shall be the ultimate tribunal to which all matters of general importance to the welfare of this Association, or any of the members thereof, shall be referred for adjustment, and its decisions thereon shall be final and conclusive. To it shall belong the power to determine the customs and usages in regard to all matters in relation to the fellowship of this Association." And further,

"Art. V, Sec. 7. A sub-committee of I. L. A. Executive Council, composed of the International Vice-Presidents of the District in which the controversy exists, together with the International President, or any International Vice-President whom he may designate to represent him are vested with authority to discipline a local or locals, by suspending or revoking their charter (or charters) if the local in question has been found guilty of violating any law of I. L. A. Constitution or working agreement. Or if it be found and determined after a hearing by said sub-committee, notice of which shall be served upon any president, vice president or secretary of the local in question, after giving the local an opportunity to act, that an element of the membership of said local are disloyal to the I. L. A. or are sympathetic with or active in the support of a dual union or are members of a dual union, and that such condition threatens to disrupt said local or has destroyed or threatens to destroy the loyalty of the union to the I. L. A.

"Section 8. Any local so disciplined to have the right of an appeal to the full International Executive Council within five (5) days after receipt of sub-committee's decision, said appeal to be addressed to either the International President or International Secretary-Treasurer, who shall submit same to full International Executive Council within five (5) days after its receipt."

The evidence shows without dispute that a condition of disunity and strife developed in Local 909 long before its charter was forfeited. Appellants contend that the strife was occasioned by an effort on the part of what they call the "Harry Bridges Union" to raid Local 909, which was a member of the International Longshoremen's Association, and an American Federation of Labor affiliate. Whatever the cause of the strife may have been, it appears from the evidence, without dispute, including admissions of the plaintiffs themselves, that the strife became so bitter that it became impossible to hold meetings of Local 909. Testimony of numerous witnesses, including the Harbor Master of the Port of Beaumont, shows that this condition seriously interfered with the loading of ships. Complaints were made to the International Longshoremen's Association, whose home office is in New York, and which, in accordance with its bylaws, sent a Sub-Committee of its executive council to the City of Beaumont. Extensive hearings were conducted in which both sides of the controversy had opportunity to appear. In fact, a number of the plaintiffs did appear, before that council. The testimony was taken down and furnished the International for the guidance of the Council in passing on the recommendations of the investigating committee. It was offered in evidence on the trial of this case. It was upon the recommendation of that Committee or Council that the charter of Local 909 was revoked and a charter issued

to new Local 1610. Some of the plaintiffs petitioned the new local for membership and were rejected. They allege that they would not have petitioned it had they known that the action in chartering the new local "was not bona fide." This brief statement, we think, indicates the general trend of the evidence. And while the plaintiffs contend, and so testified, that the affairs of old Local 909 could have been straightened out and the union continued to function, the evidence was overwhelming to support the conclusion of the investigating council that it could not.

As we see it, the question of whether or not the old local could continue to function or whether its charter should be forfeited and a new local chartered was for the parent organization, the International Longshoremen's Association, acting in conformity with its bylaws and through its properly constituted tribunals, to determine. The International Longshoremen's Association, like many lodges and churches, is a self-governing organization, providing in its laws methods for its own government. All members, including the plaintiffs, had subscribed to and were bound by those laws. Courts have no power or jurisdiction to supervise or regulate the internal affairs of such self-governing organizations. Assuming that the constitution and bylaws do not contravene the law of the land, and there is no contention that they do in this case, the courts' powers are limited in a controversy of this nature to the questions of determining whether or not such constitutions and bylaws were substantially complied with and whether or not the officials involved acted in good faith in taking the action complained of. It is not for the courts to determine as an original proposition that some other action would have been better. The courts can only determine whether the officials charged, under the facts and circumstances shown, had reasonable cause in the exercise of an honest judgment to take the action complained of. Many authorities we think support this proposition. Frasher v. Buck, Tex.Civ.App., 234 S.W. 679; Harris v. Missouri Pac. Ry. Co., D. C., 1 F.Supp. 946; Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131; Watson v. Jones, 13 Wall. 679, 20 L.Ed. 666; Sherard v. Walton, D.C., 206 F. 562.

Were courts to convert themselves into agencies for the exercise of supervisory control over the internal affairs of labor unions, and similar self-governing organizations, they would soon find themselves loaded down with such duties, to the exclusion or serious impairment of the functions for which they were created. Also, the rights of citizens to maintain self-governing associations, for their mutual benefit, under rules and regulations of their own making, would be jeopardized by a constant threat of being hailed into court and mulched in damages, at the suit of some disgruntled member. That courts have confined their inquiries in such matters to the narrow limits above stated, is founded in sound public policy, as well as established precedent.

It naturally follows from what we have said above that as a matter of law the plaintiffs had no cause of action. The judgment of the trial court should be reversed and rendered, and it is so ordered.

Reversed and rendered.

O'QUINN, J., concurs.