Argued November 27, 1951, reversed March 5, petition for rehearing denied May 28, 1952

WAY ET AL. *v.* PATTON ET AL.
241 P. 2d 895

38

*Clif Langsdale,* of Kansas City, Mo., argued the cause for appellants. With him on the brief were Hicks, Davis and Tongue, of Portland.

*James L. Means* and *C. X. Bollenback,* of Portland, argued the cause and filed a brief for respondents.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK, LATOURETTE and TOOZE, Justices.

HAY, J.

This suit is the outcome of a controversy between a subordinate local lodge of a labor union and its parent organization. The plaintiffs, Bill Way, Joe Brady and Larry Pabst, for themselves and for all other members of Mt. Hood Lodge Local 72, International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America (hereinafter called the Local), a voluntary association, instituted this suit against Homer Patton and Charles MacGowan, for themselves and all other members of International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America (hereinafter called the International), a voluntary association, and others, seeking injunctive relief as hereinafter set forth. Mr. Mac-Gowan is President of the International, and will be referred to herein as the International President. Mr. Patton is the Vice-President of the International for the Pacific Northwest District, which includes the territory over which the jurisdiction of the Local extends.

The amended complaint, among other matters, alleged as follows: Plaintiffs were elected by the local union as "Waterfront Business Agent", "Field Business Agent", and "Dispatcher", respectively. The

International President had informed the Local that such an election would be a violation of the union constitution, and, subsequent to the election, endeavored unsuccessfully, both by persuasion and threats, to cause the Local to rescind such election; threatened plaintiffs and the Local with disciplinary action unless plaintiffs resigned; attempted to compel the Local to adopt by-laws requiring the appointment of assistant business managers; and instructed the business manager to appoint other assistants. The International President had for some years attempted to seize control of the Local and its funds, and dissatisfaction had resulted in the Local, and confusion in the minds of employers as to the identity of the Local's representatives. An injunction was prayed for to require defendants to cease from interfering with plaintiffs in the performance of the duties of the respective positions to which they had been elected as aforesaid.

A general demurrer to the amended complaint was overruled, whereupon defendants answered, in effect by general denial, and with the following affirmative defenses: (1) Under the constitution of the union, the controversy herein is one which should be decided by the International President, and the court has no power to intervene; (2) plaintiffs have failed to exhaust their internal remedies within the union; (3) plaintiffs do not come into equity with clean hands; (4) the case involves a dispute over representation, into which the court, by § 102-925, OCLA, is prohibited from intervening; and (5) under the First and Fourteenth amendments to the Constitution of the United States, the issuance of an injunction as prayed for would be unconstitutional.

The cause having been put at issue by plaintiffs' reply, in due course a hearing was had, and, on April

20, 1950, the court rendered a memorandum opinion in favor of plaintiffs, and entered a decree restraining and enjoining defendants, in accordance with the prayer of the amended complaint. From this decree, the defendants, with the exception of defendant Charles MacGowan, have appealed.

Article II, § 1, of the subordinate lodge constitution, provides as follows:

"The officers of each Subordinate Lodge shall consist of a President, Vice-President, Treasurer, Inspector, Inside Guard, Outside Guard, Recording Secretary, Financial Secretary, Corresponding Secretary, a Board of Trustees composed of three (3) trustees, and a Business Manager, where one is considered necessary. The above named officers shall be the full and complete list of officers who shall be elected by each Subordinate Lodge, and they shall be responsible to the International President and the Executive Council in conformity with their respective duties. Other positions within a Subordinate Lodge, such as stewards, committeemen and delegates to various other business, may be elected or appointed as each lodge shall determine for itself, but they shall not be confused with the regular list of officers as outlined above."

The duties of business manager are set forth in article II, § 11, Subordinate Lodge Constitution, as follows:

"* * * The duties of a Business Manager shall consist of organizing, negotiating, handling grievances under existing agreements, assigning members to work, collecting dues and such other duties as the Subordinate Lodge or the International President may require. * * *"

In 1948, defendant Elmer Williams was elected business manager of the Local. On May 25, 1949, the

Local adopted a motion to "elect a dispatcher to dispatch all men, and a field Business Agent to take full charge of all field work, both to work in conjunction with the Business Agent and to be elected for a period of one (1) year from July 1, 1949, to July 1, 1950." Prior to that time, the business manager had appointed his assistants. It was developed upon the hearing that one objection which the members of the Local had to the appointment of assistants by the business agent was that they felt that appointed assistants tended to serve the business agent rather than the organization, and brought about "a one-man organization."

A copy of the minutes of the meeting of May 25, 1949, was forwarded to the International President, in accordance with the required procedure in such matters, and upon receipt thereof the International President, on June 6, 1949, notified the President of the Local, by telegram, that an election such as was proposed by the minutes would be in direct violation of the union constitution. The President of the Local did not respond to such telegram, but, on June 8, 1949, the Local adopted a motion amending a portion of the minutes of its May 25 meeting, as follows:

"Under heading of 'New Business'—'Moved and seconded that we elect a dispatcher to dispatch all men, and a field business agent to take full charge of all field work' should have read—'Moved and seconded that we elect a dispatcher to dispatch all men, and an assistant field work business agent to take full charge of all field work.' "

At the same meeting action was had which is reflected in the following minute:

"Amendment to the amendment that was passed at the meeting of May 25th, 1949 in regards to the appointing of an Assistant Field Business Agent,

that we elect a Sick Steward and part-time Business Agent, and a Ship Repair Assistant Business Agent, and that they work in conjunction with the Business Manager, to be nominated next meeting night. Carried.

"A motion was then made and seconded that we hold the nomination of the elected employees at the next regular meeting, June 22, 1949, and that the election of these, and those nominated tonight, June 8th, for Dispatcher and Assistant Field Business Agent be held Friday, July 1, 1949, from 10:00 AM to 12:00 PM by printed ballot, and all members be notified. Carried."

The minutes of a regular meeting of the Local held June 22, 1949, include, under the head of "Nominations of Officers," the following: "Nominations of officers was then in order for Combination Sick Steward and Part Time Assistant Business Agent, and an Assistant Waterfront Business Agent." On June 23, 1949, the International President confirmed by letter to the Local his telegram of June 6 disapproving the proposed election. On June 28, 1949, the President of the Local replied, contending that the election would not violate the union constitution, and enclosing a sample ballot for the International President's approval. On July 1, 1949, the election was held, plaintiff Bill Way being elected Waterfront Business Agent, plaintiff Joe Brady, Field Business Agent, and plaintiff Larry Pabst Dispatcher, all to act as assistants to the business manager and work in conjunction with him. On October 26, 1949, a motion was adopted by the Local to change the designations of such elected personnel from assistant business managers to stewards.

By letter dated July 22, 1949, the International President answered at some length the local presi-

dent's letter of June 28, and therein again ruled that the election of plaintiffs was in violation of the union constitution. On November 14, 1949, the International President, by letter, directed plaintiffs to resign the positions to which they had been elected. At the same time, he directed the officers of the Local to refrain from paying plaintiffs. Thereafter, an International Vice-President, acting as president in the latter's absence, directed the business manager, by telegram, to appoint assistants, who accordingly appointed as his assistants defendants Ray Beardon and Max Kalbrenner, whose salaries the International directed the Local to pay. These matters are stated merely for the purpose of completing the picture. The present controversy appears to be a continuation or an outcome of previous disputes between the International and the Local. See *Mursener v. Forte,* 186 Or 253, 205 P2d 568, and cases referred to therein.

■ It is contended by defendants that plaintiffs are not entitled to relief herein because they made no attempt first to exhaust the remedies within the union afforded by its constitution. The parties concede that it is the general rule that the articles of agreement or constitution of a trade union is a contract, and is binding as such upon the members. It is conceded further that, out of such contractual relationship, there arises an implied obligation that a member of the union, before resorting to the courts for settlement of a controversy with the union or its members, must first exhaust the remedies which have been afforded him for the settlement of such controversies within the union, whether by appeal or otherwise. If he brings suit without having done so, his suit is prematurely brought and must fail. Dangel and Shriber, Labor Unions, § 281, p 307; 31 Am Jur, Labor, § 67; 63 CJ,

Trade Unions, § 58; *Hall v. Morrin,* Mo App, 293 SW 435, 440; *Stanton v. Harris,* 152 Fla 736, 13 S2d 17, 18; *Dragwa v. Federal Labor Union,* 136 NJ Eq 172, 178, 41 A2d 32; *Snay v. Lovely,* 276 Mass 159, 176 NE 791, 793; *Fish v. Huddell,* 60 App DC 263, 51 F2d 319, 320; *Cromwell v. Morrin,* 91 NYS2d 176, 181; *Grand International Brotherhood, etc., v. Marshall,* Tex CCA, 146 SW2d 411, 412; *Cameron v. International Alliance T. S. E., etc.,* 118 NJ Eq 11, 176 A 692, 97 ALR 594, 602; *Mursener v. Forte,* supra, 186 Or 253, 272, 205 P2d 568.

The provisions of the International Constitution, which, as defendants contend, provide a right of appeal within the union applicable to the situation in the present case, are as follows:

"The Executive Council shall have supervision over the International Brotherhood when not in convention session. Its meetings shall be held annually, unless conditions warrant special meetings. It shall have the power to pass on any subject, proposition or grievance, and hear and determine all cases of appeal from the decisions and rulings of the District, State and Subordinate Lodges, or against any officer of this International Brotherhood or appointed officer. All decisions of the Executive Council shall be final." Art III, § 4.

"The Executive Council, in conformity with the Constitution and By-laws, and with the convention declaration of policy as its guide, shall hear and determine all grievances referred to it, and shall recommend remedies or adjust the same as the gravity of the case may require." Art III, § 5.

"The International President shall be authorized whenever the interests of this International Brotherhood demand, to convene the Executive Council in special session to determine such matters as may be brought before it." Art III, § 9.

"Whenever the International President shall submit any question to the Executive Council and the Executive Council acts upon it, either by correspondence or by telegraph, he shall at once notify all members of the Executive Council and all other parties interested the results of its action." Art III, § 10.

"The original action of the International President to discipline either a member or members or an officer or officers of a District, State or Subordinate Lodge, or a District, State or Subordinate Lodge, shall remain in full force and effect until set aside or modified by the trial committee, or in the event of an appeal, by the Executive Council." Art V, § 3 (h).

"No individual member, or officer, or District, State or Subordinate Lodge subjected to discipline or penalty as provided by this Article, or as provided by Article XIV of the Subordinate Lodge Constitution, shall resort to any civil court in any action for the purpose of setting aside, changing, or modifying said disciplinary action, until the said member, or officer, or District, State or Subordinate Lodge shall have first exhausted the procedure for trial and appeal, provided by the International Constitution and By-Laws or the Subordinate Lodge Constitution and By-Laws." Art V, § 5.

"The International President shall hear and decide all questions of constitutional law submitted to him by any District, State or Subordinate Lodge, and all decisions shall be binding until finally passed on by the Executive Council, or the International Brotherhood Convention." Art V, § 10.

Among the powers vested in the International President by the constitution are the following:

"The International President shall have direction and supervision of all District, State and Subordinate Lodges. He shall be empowered to suspend individual members or officers of District, State and Subordinate Lodges, and meetings of

District, State and Subordinate Lodges according to the procedure herein provided, when, in his judgment the actions of the members, officers or lodges are in violation of the International Constitution and By-Laws, or the Subordinate Lodge Constitution and By-Laws, or in violation of the declared policies of this International Brotherhood." Art V, § 2.

■ "Supervision" means oversight; and "direction" means a guiding or authoritative instruction; prescription; order; command. (Webster) It is patent, we think, that the International President had authority to oversee the proposed action of the Local to elect assistants to the business manager, to warn the Local and its officers that, in his judgment, such action would violate the International Constitution, and, when his warning had been disregarded, to order the Local, and any of its officers or members, to take the necessary steps to restore the status quo. These matters, in our opinion, are all properly to be regarded as in the nature of disciplinary measures.

No attempt was made by plaintiffs to exhaust or even make use of the remedies of appeal provided within the constitution of the union, particularly appeal to the executive council from the rulings of the International President of which they complain herein.

■ Plaintiffs assert, however, that the constitution did not actually give them any *right* of appeal. They say that an analysis of the quoted sections shows that a decision by the International President upon a question of constitutional law "is binding 'until finally passed on by the Executive Council, or the International Brotherhood Convention.' " According to their interpretation, Art III, § 4, supra, does not apply to cases arising under Art V, § 10 (constitutional interpre-

tation), ''because it negatives any question of action thereon by the International Convention and provides that the action of the Executive Council shall be final.'' We do not follow counsel. Our interpretation of Art III, § 4 is, that the executive council has supervision over the international brotherhood when not in convention session; it holds annual meetings, and special meetings on call; it has authority to hear and determine all cases of appeal from the decisions and rulings of the district, state and subordinate lodges, ''or against any officer of this International Brotherhood'' or appointed officer. We interpret the quoted portion above to include decisions of the International President. Under Art III, § 4, on appeal from a decision or ruling of any officer of the International (including the President), the decision of the executive council is final. The international brotherhood convention, when assembled, is constitutionally the highest tribunal of the union, and has complete jurisdiction over the international and over all district, state, and subordinate lodges. (Art I, § 2, Constitution) It has full legislative, executive and judicial powers (Art I, § 3, Constitution), but when not in convention its executive and judicial powers are vested in the international executive council. (Art I, § 4, Constitution) In other words, when the international convention is not in session, the international executive council is the union's final appellate tribunal.

Plaintiffs suggest that the only way in which, under the constitution, any question could be submitted to the executive council would be by submission thereof by the International President, under the general provisions of Art III, § 10, as a matter of grace and not of right. We do not think that the section referred

to may be construed as confining the right of appeal to such cases only as the International President shall allow. It has reference to emergency sessions of the council.

We do not agree that, as plaintiffs argue, the provisions of the constitution extend the remedy of appeal as a privilege rather than as a right. Oregon cases cited by plaintiffs in this connection, such as *Spicer v. Benefit Ass'n of Ry. Emp.*, 142 Or 574, 602, 17 P2d 1107, 21 P2d 187, 90 ALR 517, and *Perry v. Oregon Liquor Commission*, 180 Or 495, 498, 177 P2d 406, which hold that an appeal from the decision of a court is not a common-law or constitutional right, but a statutory privilege only, have no bearing upon this point, for, while it is true that "right" and "privilege" in this sense are not exactly synonymous, the right of appeal given by the union constitution is a part of the contractual rights of the members of the union.

In our opinion, the right of plaintiffs to appeal in this case did not depend upon the grace or whim of the International President. By definite implication, at least, Art III, § 4, of the constitution gives a right of appeal to the international executive council from decisions of any officer of the International Brotherhood (including, of course, the International President).

The only cases cited by plaintiffs in support of their contention that appeal must be a matter of right and not a mere privilege, are *Walsche v. Sherlock*, 110 NJ Eq 223, 159 A 661, 665, and *Nissen v. International Brotherhood*, 229 Iowa 1028, 295 NE 858, 141 ALR 598, 610. We think that these cases are distinguishable from the case at bar. The Walsche case specifically recognized the general rule that, in controversies between a member of a voluntary association and the

association, "the remedies within the organization provided in the constitution and by-laws must be exhausted before appeal to the courts." But the appeal provisions in that case were found to be "futile, illusory and vain," and for those reasons it was held that it was not necessary for the plaintiffs to have exhausted such remedies before seeking a remedy in a court of law. Moreover, while there were provisions of the constitution authorizing appeals to the executive council, there was no assurance that there would ever be a meeting of that body. In the Nissen case, there was a provision of the constitution that an aggrieved member might appeal to the joint council, and, where no joint council existed, that either party might appeal to the general executive board of the International. The constitution provided that the general president, general secretary-treasurer, and first vice-president of the international brotherhood should have power to call a meeting of the general executive board whenever in their judgment they deemed such action necessary. The court considered that such provisions rendered appeals a matter of grace and not of right, made the internal remedy of appeal an illusory one, and, properly, as we think, relieved the plaintiffs of their obligation to pursue such internal remedy before resorting to the courts.

██ But plaintiffs insist that, even if they had a right of appeal to the executive council, it would have been futile for them to have invoked it. They contend that the executive council was under the domination of the International President, and that it had predetermined the controversy adversely to the Local. Their reply so alleged, and stated that, prior to October 8, 1949, the International President had consulted the executive council concerning such controversy, and

that, on or about October 11, 1949, three members of the executive council, acting upon instructions from the International President by authority of the executive council, came to Portland and endeavored to cause the members of the Local to rescind the election of plaintiffs as assistant business managers or stewards. We do not find, however, that there was any proof that the executive council was under the domination of the International President. The executive council consists of the International President and 13 international vice-presidents. The territory under the jurisdiction of the International—that is to say, the United States and Canada—is divided by the constitution into 13 territorial sections. There are 13 international vice-presidents, one elected from each territorial section. There was no evidence that the International President had consulted with the executive council in relation to his interpretation of the constitutional questions involved herein. There was evidence, however, that he did consult with the executive council to secure authority to send a committee of three vice-presidents to Portland to meet with the members of the Local in "an attempt to resolve the difficulties and straighten the matter out," to see if they could work out peace and harmony, and, if they failed in such endeavor, to report back to the International President with their recommendations. The sending of such committee was authorized, and the persons appointed thereon were Vice-President Pendergast of New York, Vice-President Grant of East St. Louis, and Vice-President Berg of Minneapolis. It is true that this committee, in consultation with the Local, endeavored to persuade it to accept the International President's interpretations of the constitution. To that extent it may be inferred that those three, of an

executive council comprising 13 members of the union, had prejudged the controversy. But there is no evidence that the executive council as a body had done so, and we cannot assume that it had. In the absence of evidence to the contrary, we must assume that the executive council would have performed the duties of its office honorably and conscientiously. *Snay v. Lovely,* supra, 276 Mass 159, 176 NE 791, 793; *Fish v. Huddell,* supra, 60 App DC 263, 51 F2d 319, 320; *Hall v. Morrin,* supra, Mo App 293 SW 435, 441.

 It is urged that appeals to the international convention would involve an intolerable delay, and hence would be futile. Assuming that such an appeal was available to plaintiffs, it does not appear that the delay involved would be intolerable in the sense for which they contend. Plaintiffs cited in this connection the cases of *Gleeson v. Conrad,* 81 NYS2d 368 and *Kaplan v. Elliot,* 145 Misc 863, 261 NYS 112, 117. In the Gleeson case, the plaintiffs had been tried by the local executive board upon charges which may be described generally as disloyalty to the union and disobedience of its rules and regulations. The local executive board found them guilty and expelled them from membership. They appealed to the general executive board, which modified the sentence by imposing a fine and temporary suspension. Under the constitution, they had a right of further appeal to the next convention, but there would have been no convention for about three years. The court held that a delay of three years was unreasonable, and that such an appeal need not be taken. In the Kaplan case, the general executive board of the union had adopted a resolution summarily removing the plaintiff from his office as president of a local. His only right of appeal was to the international alliance in convention, which would

not convene for about two years. The difficulties of obtaining a special convention were almost insuperable, and, by the time the general convention assembled, the term for which plaintiff had been elected would have expired. Under those circumstances, the court held that it would be unreasonable and a practical denial of justice to require that plaintiff should exhaust his remedy within the order before bringing an action in the civil court for reinstatement. Neither of the cited cases appears to be persuasive authority in the present case. In the Gleeson case, plaintiffs had been deprived of their means of livelihood; in the Kaplan case, the delay involved would have rendered the question moot by the time an appeal could have been heard. In the case at bar, plaintiffs were entitled to appeal to the international executive council. As they made no attempt to do so, the question of whether or not they had a right of appeal to the international convention is immaterial. But, if they did have such right of appeal, the fact that the international convention meets once a year would seem to imply that an appeal to that body would be likely to result in at least as speedy a determination of the controversy as might be anticipated from a resort to the civil courts. In any event, the provisions for appeal within the union are a part of the constitution, and the members of the union, including plaintiffs, are bound thereby contractually. *Fish v. Huddell,* supra, 60 App DC 263, 51 F2d 319, 320; *Snay v. Lovely,* supra, 276 Mass 159, 176 NE 791, 793; *Greenwood v. Building Trades Council of Sacramento,* 71 Cal App 159, 233 P 823, 826; *Gallagher v. Harrison,* 86 Ohio App 73, 88 NE2d 589, 592.

■ Plaintiffs say that they believe that the evidence demonstrates that the conventions of the international brotherhood are so "rigged" that only the results

which the international president desires can be accomplished. As to this, we can say only that plaintiffs' belief in that regard is not sustained by any evidence, and is immaterial.

It is asserted that property rights are involved in this suit, and that, where such rights, as distinguished from mere social rights, are involved or affected, the courts will intervene, even though the remedies within the union have not been exhausted by the aggrieved parties. The property rights to which they refer are (a) their own rights in respect of the positions to which they were elected, (b) the right of the members of. the Local to be represented by agents of their own choosing, and (c) the interest of the members in the assets of the Local.

■ At the time when the International President ruled that, under the constitution, "assistant" business agents could not be elected by the local union, plaintiffs had no property rights whatever in the premises, as they had not yet been elected. *Higgins v. Sweitzer, County Clerk,* 291 Ill 551, 126 NE 207, 208.

■ Plaintiffs cite, in this connection, *Walsche v. Sherlock,* supra, 110 NJ Eq 223, 159 A 661, 663, which states what we conceive to be in such cases the rule where property rights are concerned, and, as we think, states it against their own contentions. We quote from the opinion:

> " '(1) Where the question is a social one, involving discipline or the conduct or standing of a member, he must exhaust his remedy within the organization, if such remedy is provided before invoking the aid of courts of law. See Grant v. Ancient Order of Foresters, 75 N.J.Law, 109, 66 A. 902; Zeliff v. Knights of Pythias, 53 N.J. Law, 536, 22 A. 63.

" '(2) But, if the controversy involve property rights, then *in the absence of regulations amounting to an express agreement to exhaust remedies within the order,* the courts will intervene to protect such property rights. Byrne v. Supreme Circle, 74 N. J. Law, 258, 65 A. 839, was a case in this class.

" '(3) On the other hand, *even if property rights are involved, still, if the rules of the organization provide a remedy within that body, and members have agreed to exhaust that remedy before application to the law courts, the latter will not interfere until that remedy has been exhausted.* Ocean Castle v. Smith, 58 N. J. Law, 545, 33 A. 849, affirmed Smith v. Ocean Castle, 59 N. J. Law, 198, 35 A. 917.

" '(4) But in case of property rights it should be clear that these are cognizable by the tribunals established within the order. Roxbury Lodge v. Hocking, supra.' " (Emphasis ours.)

██ In the case at bar, there is in the constitution a regulation "amounting to an express agreement to exhaust remedies within the order." See Art V, § 5, quoted supra. So that, even if plaintiffs had a property right in the positions to which, subsequent to the ruling of the International President of which they complain, they were elected, it seems to us to be clear that, in respect of such rights, they have expressly agreed to exhaust the remedies provided in the organization before invoking the aid of the civil courts.

██ Conceding the broad principle that the members of the Local have a right to be represented by agents of their own choosing, the application of such principle to the facts of the present controversy is not clear. It is said in the case of *Quinn v. Marvin,* 168 Or 52, 59, 120 P2d 227, cited by plaintiffs, that "The power is always inherent in a local union to determine who

shall be the officers thereof." And in *Dusing v. Nuzzo,*
177 Misc. 35, 29 NYS2d 882, 884, also cited by plain-
tiffs, it is said:

> "* * * If a member has a 'property right' in
> his position on the roster, I think he has an equally
> enforcible property right in the election of men
> who will represent him in dealing with his economic
> security and collective bargaining *where that right
> exists by virtue of express contract in the language
> of a union constitution. * * *"* (Emphasis ours.)

But it does not appear in the present case that there
was any language in the union constitution authorizing
the election of assistant business agents, nor does it
appear that assistant business agents, or stewards,
are regarded as "officers" of a subordinate lodge. See
Art II, § 1, of the subordinate lodge constitution, quoted
supra.

The constitution having provided for the election
of a business manager, where one is considered neces-
sary, and the Local in this case having duly elected
a business manager, it was, in that connection, repre-
sented by an agent of its choosing. Plaintiffs assert
that such business manager was guilty of improper
conduct in relation to his official duties. If so, surely
the proper procedure was to have filed charges against
him, and, upon proper notice, to have subjected him
to a trial, for which course of action procedure is pro-
vided in the subordinate lodge constitution.

The assets of the Local are estimated to be of the
value of approximately two million dollars. Unques-
tionably, as plaintiffs assert, these assets are trust
funds, which are held for the benefit of the members
of the Local. *Mursener v. Forte,* supra, 186 Or 253,
269, 205 P2d 568. But the present suit does not involve
the ownership or control of such assets. The primary

purpose of the suit, in our opinion, is to determine whether or not the Local may elect "assistant" business managers, contrary to the ruling of the International President that such an election would violate the constitution of the union.

The business manager is a very important officer of the Local. From the nature of his duties it is apparent that he must be experienced in the particular trade or craft, well-versed in labor disputes, including negotiating and bargaining with employers, and entirely trustworthy. He is required to be under bond, and the subordinate lodge constitution makes him "responsible to the International President in conformity with" his duties.

Courts will not ordinarily intervene in the internal affairs of the union. A union may, by its constitution, provide an exclusive and final method of resolving all internal disputes, including questions of constitutional interpretation. Such provisions are contractual in nature, and binding upon all union members. 31 Am Jur, Labor, § 66; 63 CJ, Trade Unions, § 13; Dangel and Shriber, Labor Unions, § 280; *International Longshoremen's Association v. Graham,* Tex CivApp, 175 SW2d 255, 257; *Snay v Lovely,* supra, 276 Mass 159, 176 NE 791, 793.

In *United Brotherhood of Carpenters, etc. v. Local No. 14,* Tex Civ App, 178 SW2d 558, 567, the rule is stated as follows:

"* * * these rules and laws are not viewed in the same light by the civil courts as is a statute passed by a legislature. The power to interpret a statute is vested in the courts. The power to interpret a law or rule of a voluntary association is generally vested in some officer, committee or board of the association itself. We would not be

justified in regarding as nugatory the action of an officer clothed with the power to 'decide all points of law, appeals and grievances' unless such action was wholly unsupported by any reasonable view or construction of the laws of the association.' "

Mr. Justice Frankfurter, in a dissenting opinion, concurred in by Chief Justice Stone and Justices Roberts and Jackson, in *Elgin, J. & E. R. Co. v. Burley*, 325 US 711, 757, 89 L ed 1886, 65 S Ct 1282, said in part as follows:

"* * * Union membership generates complicated relations. Policy counsels against judicial intrusion upon these relations. If resort to the courts is at all available, it certainly should not disregard and displace the arrangements which the members of the organization voluntarily establish for their reciprocal interests and by which they bound themselves to be governed. * * * To ask courts to adjudicate the meaning of the Brotherhood rules and customs without preliminary resort to remedial proceedings within the Brotherhood is to encourage influences of disruption within the union instead of fostering these unions as stabilizing forces. Rules of fraternal organizations, with all the customs and assumptions that give them life, cannot be treated as though they were ordinary legal documents of settled meaning. * * * To an increasing extent, courts require dissidents within a union to seek interpretation of the organization's rules and to seek redress for grievances arising out of them before appropriate union tribunals. * * *"

Plaintiffs do not appear to controvert the foregoing propositions, but assert, notwithstanding, that courts, particularly if property rights are involved, will review the decisions of a union tribunal or tribunary officer to determine whether such decisions were fraudulent, arbitrary or unreasonable, were the result

of gross mistake of fact or of law, or were legislation in the guise of interpretation. In this connection, they cite *Rueda v. Union Pacific Railroad Co.*, 180 Or 133, 156, 175 P2d 778, in which, in discussing the general question of the exclusiveness of remedies provided in arbitration agreements, this court said:

> "* * * A common-law award is, of course, not self-enforcing. An action at law must be brought upon the award. The court will enter judgment upon it, but not if the award was fraudulent or arbitrary or the result of gross mistake of fact, or if it appears that the arbitrators intended to follow the law and then based the award on a clear misapprehension concerning the law. * * *"

■ As the Rueda case did not involve any question of appeal within a voluntary association, it is hardly in point. But in any event, there was no evidence in the case at bar that the decision or ruling of the International President was impaired by fraud or any of the other debilitating factors above mentioned. True, there was evidence indicating that there was, on the part of members of the Local, hostility to the International President, suspicion of his motives and doubt of the impartiality of the committee of conciliation which he caused to be sent to parley with the Local. But we have been unable to find any credible evidence in the record to indicate that the International President was guilty of fraud, oppression or bad faith in making the particular rulings complained of, or in his negotiations with the officers of the Local in respect thereof.

■ It is suggested that no constitutional question was actually submitted to the International President by the Local. However, the constitution of the subordinate lodge requires the corresponding secretary to

make monthly reports to the International President, covering certain statistical data, and including all information obtainable concerning, among other matters, "grievances of the craft in the locality." Moreover, the evidence discloses that it was the custom of the Local to send a copy of the minutes of every one of its meetings to the International President. Without receiving such copies and other information, the International President could not properly have performed his duties of supervision and direction of the Local. Art II, § 3, of the subordinate lodge constitution requires the President of the Local to "see that all instructions of the International President are complied with and that the Constitution and By-Laws of * * * [the] International Brotherhood are obeyed." In our opinion, submission of the minutes of the Local's meetings, and particularly of the minutes of the meeting at which the Local resolved to elect assistants to the business manager, coupled with the International President's power of supervision and direction, sufficiently establish the fact that the controversy was submitted to the International President and was constitutionally determined by him through his directions to the President of the Local.

■ We are of the opinion that the failure of the plaintiffs to exhaust the internal remedies provided for them by the union constitution debarred them from seeking relief in the courts.

The decree appealed from will be reversed, with costs, and the cause dismissed.

Tooze, J., took no part in the consideration or decision of this case.