Argued February 5, 1968, affirmed February 19, petition for rehearing denied July 1, 1969

PHILLIPS ET AL, *Respondents and cross-appellants, v.* PERRIN ET AL, *Appellants.*

Case No. 302-117

BURNELL ET AL, *Respondents and cross-appellants, v.* PERRIN ET AL, *Appellants.*

Case No. 302-118

450 P2d 767

*Don S. Willner*, Portland, argued the cause for appellants. With him on the briefs were Willner, Bennett, Leonard & Burns, Portland.

*Hugh Hafer*, Seattle, Washington, argued the cause for respondents. On the brief were Bassett, Donaldson & Hafer, Seattle, McInnis, Wilson, Munson & Woods, Washington, D. C., and Galton & Popick, Portland.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

PERRY, C. J.

Defendants, on behalf of a regional labor union recently organized in the pulp and paper industry, appeal from a circuit court decree awarding to two old international unions some $160,000 taken from the treasuries of 32 local unions that seceded from the re-

spective internationals in 1964. The money was, for the most part, expended to form the new union.

The plaintiffs substantially interested in the funds are the United Papermakers and Paperworkers and the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. The two internationals caused to be brought two representative suits which were consolidated for the purposes of trial. The principal defendant in each is the Association of Western Pulp and Paper Workers, the new union organized by or on behalf of the seceding locals. Except when it becomes necessary to designate a specific person or party by name, the parent unions will be referred to hereinafter jointly as the internationals, and the new union will be referred to as the association.

Prior to 1964, and for many years, most of the workers in the pulp and paper industry were represented throughout the United States by one or the other of the two internationals. Before the merger of the American Federation of Labor and the Congress of Industrial Organizations in 1955, the two internationals had been in competition for bargaining rights. Thereafter, they have cooperated in representing various segments of the work force in the paper industry. During 1964, most of the Oregon local unions, together with similar locals in Washington and California, seceded or disaffiliated from their respective international unions. Prior to the final act of secession, many of the local unions transferred funds to a committee that had been established for the purpose of organizing a new union to represent paper workers in the western United States. The committee spent some $160,000 in organizing and launching the association as a new labor union. For the purposes of this appeal, the parties are in substantial

agreement about the source of the funds and the use to which the money was put.

With the exception of $2,000, all the disputed moneys were transferred before the local unions terminated their relationship with the internationals. The locals treated the funds as unencumbered assets and the transfer of the funds as expenditures for local purposes. The association insists in this court that these transfers were nothing but ordinary expenditures prior to secession. The trial court held that, whether the funds and other property were transferred by the locals before or after the particular local terminated its relationship with its international, the transfers were made for the purposes of financing the rebellion and were intended to put the assets beyond the reach of the international's constitution. The court held that substance controlled over form, and that under the international constitutions the parties to the transfers were accountable for the property transferred.

We agree that the substantive question is whether the locals were entitled, because of corruption, tyranny, or some other reason, to take their property with them when they seceded from the internationals, or whether, regardless of misconduct alleged against the internationals, the internationals were entitled to the enforcement of their constitutional provisions governing the disposition of the funds of local unions withdrawing, seceding,[1] or disbanding.[2] There is no ques-

---

[1] Constitution, United Papermakers and Paperworkers, ART XII, § 3: "* * * All property of any local union attempting to *withdraw* or *secede* from the International Union, whether taken into possession of a trustee or not, shall become a Trust Fund of the International Union, to be used first for the benefit of the local union and second for the benefit of the International Union and its members." (Emphasis added.)

tion but that the locals were free to secede if they so desired. The question is whether they were entitled to take their money with their members when they seceded. Other issues will be noticed only as they present questions that necessarily bear upon the substantive question of whether or not the forfeiture, or reversion, clauses of the international constitutions are to be enforced.

A companion case between one of these same internationals and the association, and involving the same substantive question, has recently been decided against the international in the state of Washington. See *International Bro. of Pulp, S. & P.M. Wkrs. v. Delaney,* 73 Wash 2d 956, 442 P2d 250 (1968).

In the Washington litigation, the court held that in the absence of a constitutional prohibition against withdrawal, a local union could, by unanimous vote of its members, terminate its relationship with the international and retain all funds in its possession notwithstanding the contrary provisions of the international constitution. The court held that to enforce the constitutional provisions would work a forfeiture, and that a forefeiture should be avoided if possible.

The Washington court was of the opinion that a forfeiture could be avoided by construing the constitutional language strictly against the party seeking the forfeiture. The opinion then proceeded to construe

---

② Constitution-Bylaws, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, Art XII, § 4: "If a local union fails to keep within the laws of the International Union and is suspended; or if a local union is *disbanded* because of the shutting down of an operation; or for any other cause, all books, moneys and properties of the local union shall become the property of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. The Executive Board shall take proper legal steps against any local union officers or members failing to comply with this provision." (Emphasis added.)

the word "disband" as found in the Pulp and Sulphite International constitution as not broad enough to include such meanings as "disaffiliate," "secede," or "withdraw."

In the Oregon litigation, the two internationals have combined their efforts, and the two constitutional clauses have been treated throughout the Oregon litigation as having substantially equal meaning, regardless of the different words employed in each version. We hold that the words in each clause were intended to have substantially the same meaning.

■ In the absence of compelling legal reasons for ignoring the provisions of international union constitutions, internationals are entitled by law to the enforcement of their constitutional provisions concerning the property of local unions that secede from the international. *Way et al v. Patton et al,* 195 Or 36, 241 P2d 895 (1952); *Carpenters Union v. Backman,* 160 Or 520, 528, 86 P2d 456 (1939); *Bradley v. O'Hare,* 11 App Div 2d 15, 29, 202 NYS2d 141, 154 (1960), and see cases collected in the Annotation, 23 ALR2d 1209, 1214-1216 (1952).

In *Crocker et al v. Weil et al,* 227 Or 260, 361 P2d 1014 (1961), we ruled in favor of the seceding local unions against an international union's assertion that it was entitled to the assets of the seceding locals under a somewhat similar constitutional provision. We concluded that the international had, by its own material breaches of the contractual relationship between itself and its rebellious locals, excused performance by the locals of the obligations under the international constitution. In *Crocker v. Weil,* corruption was proved on a massive institutional scale. The corruption had resulted in the expulsion of the international from the AFL-CIO federation and the charter-

ing by that federation of a rival international to which honest locals were encouraged to affiliate.

The association argues on appeal that, notwithstanding differences between the facts in *Crocker v. Weil* and those in the present litigation, the principle of *Crocker v. Weil* supports the right of dissatisfied local unions to retain control of the property in their possession. The association urges that in equity and good conscience the disputed property belongs to the working men and women represented by the association and not to the international unions who have been repudiated by their former local members.

The association argues, in effect, that, regardless of factual distinctions between the cases, the public policy of the state of Oregon, as announced in *Crocker v. Weil,* justifies the nonenforcement of the international constitutions because enforcement would work a forfeiture, reward tyranny, and penalize those who have sought to enhance democracy in the labor movement.

The internationals argue that, while there were charges of personal corruption on the part of certain international officers, none of the charges were shown to have been proved, either in a union tribunal or in a court of law. There were also charges of oppressive and antidemocratic procedures and practices in the administration of union affairs at the international level, and, without admitting the truth of these charges, the internationals argue that even if proved in the case at bar the charges amounted to little more than a difference of opinion about policy. None of the charges, moreover, whether proved or merely asserted, were shown to have offended the AFL-CIO federation at the national level.

Were it merely our duty to pass upon rival claims of virtue, or to pass upon the abstract equities of rival claims to property accumulated from the collection of union dues, the locally popular decision, no doubt, would allow the association in these cases to retain the property of the seceding locals that have affiliated with the association. Our function, however, is not that of judging which union, in our opinion, is the more deserving, but rather one of interpreting law, including the organic laws of the unions themselves.

The facts do not justify the assertion that the internationals have, by proven misconduct, forfeited their right to the enforcement of their own constitutions.

The trial court, in a carefully considered review of the evidence, found that some of the complaints of the Western locals were well founded: The president of one of the internationals had engaged in political maneuvering to sustain his policies and had used his power to perpetuate himself in office. There were two instances of unlawful conduct by officers of one international a number of years before this litigation erupted. The other international union had failed adequately to investigate apparently meritorious charges of corruption against one of its vice presidents. The trial court concluded, however, and the record supports the conclusion, that these isolated breaches of fiduciary duty did not play an important part, and, indeed, were not a motivating factor in the decisions on the part of the western locals to terminate their connection with the internationals. Charges of misconduct on the part of individual officers were emphasized only after this litigation was under way, and appear to have been part of an effort, after the se-

cession had been accomplished, to bring the secession within the doctrine of *Crocker v. Weil.*

Since the trial court did not believe that the evidence of wrongdoing on the part of the internationals justified the withdrawal of union funds by dissatisfied locals in any event, the trial court did not find it necessary to detail all the evidence in the record which tended to show that the principal reason for the secession was the existence of strong differences of opinion between the rank and file in the western locals and the officers of the internationals, in New York, about the best way to run the unions.

There is substantial evidence that the secession would never have occurred if the international officers had yielded to certain modest demands of western locals with reference to industry-wide bargaining practices on the west coast.

With the exception of cases decided during the 1949-1950 period involving locals breaking away from internationals alleged to be communist-dominated, and a handful of more recent cases involving locals breaking away from an international that had been found guilty of massive, institutionalized corruption, the courts have generally refrained from substituting judicial ideas of union morality for the organic law of international unions. See cases collected in C. Summers, *Union Schism in Perspective: Flexible Doctrines, Double Standards, and Projected Answers,* 45 Va L Rev 261 (1959).

For every appeal to equity by the association on behalf of members who may or may not have been the workmen whose dues actually produced the property in controversy, the internationals can marshal equally cogent arguments. A rule that would permit

seceding locals to take their property with them in defiance of international constitutional provisions whenever there is a difference of opinion about the management of union affairs could breed a renewal of raiding by rival unions as well as the fragmentation of established international unions to the ultimate disadvantage of the workmen for whom many international unions presently provide nationwide bargaining strength equal to that of industrial management.

■ We conclude that the rule derived from *Crocker v. Weil* properly applies only when there is clear evidence of international misconduct that is so fundamentally violative of the international's fiduciary obligation to the locals as to justify treating the organic law of the union as a dead letter. The facts in the case at bar fall far short of the kind of misconduct which in *Crocker v. Weil* were found to justify the locals in treating the constitutional provision as a nullity.

A number of other issues, briefed and argued with diligence, do not go to the heart of the controversy, and can be dealt with shortly.

One group of issues has to do with collateral misconduct, characterized as "unclean hands." During the pendency of this litigation, the association was led to believe that Vice President Joseph Tonelli of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers would be present to testify in the trial of these and related cases. When the anticipated witness, whose personal conduct had been alleged as evidence of corruption with reference to union finances, did not appear, the Association charged that he had been "sequestered," and that his nonappearance constituted unclean hands.

■ The trial court drew against the international all

the inferences that naturally could and should have been drawn from Tonelli's failure to appear. No one explained several transactions by Tonelli that savored of personal corruption, but the trial court held, nonetheless, that this corruption, if established, did not rise to the level of institutional wrongdoing necessary to destroy the fiduciary character of the relationship between the internationals and the locals. We agree with the trial court.

Whatever uncleanliness may have marred the strategy that caused the nonappearance of the witness, it did not amount to an outright fraud upon either the court or the other litigants, and did not rise to the level of the sort of collateral misconduct that might deny the errant litigant relief in equity. The international was under no duty to produce a witness merely to see him forced to take refuge behind his constitutional privileges against self-incrimination. The substance of any damaging evidence Tonelli could have given against his international came in from other sources. The trial court was fully advised both as to the nature and extent of Tonelli's alleged and undenied wrongdoing.

■ Another group of issues has to do with the failure of the internationals to join as parties defendant the various locals that had dissolved and re-emerged as locals of the Association. We agree with the trial court that the presence of such locals as parties was not essential. Assuming, for the purposes of argument, that the locals remained identifiable as jural entities after their disaffiliation with the internationals and their reconstitution as locals of a new union, they could have added nothing to the facts alleged and admitted in the pleadings. There was no substantive issue about where the property in ques-

tion came from, who got it, or how it was used. The presence of the locals in this litigation would have injected interesting legal questions about the entity theory applied to voluntary associations through successive incarnations, but would not, within the meaning of ORS 13.110, have shed any light on the right of the internationals to have their constitutions enforced against the admitted holder of the transferred assets.

Other issues forcefully urged in these cases have been fully considered, but as none deals directly with the basic question of the enforceability of the international constitutions, we have not prolonged this opinion with detailed consideration of each point. It is sufficient to note that these were well tried cases, with large sums as well as important questions of union government at stake.

When the record is considered as a whole, with substance separated from form, the rank and file of the western locals had serious differences of opinion with the officers in control of the international unions, and voted to secede. In the absence of explicit constitutional restrictions upon the right to secede, we assume that the locals were within their rights in seceding. It does not follow, however, that they also had the right to take the assets with them in the face of specific constitutional prohibitions to the contrary. Since we have found that the reasons for seceding were not of the character found to exist in *Crocker v. Weil*, the rule of that case does not apply in these cases, and the international constitutions are entitled to prevail as written.

Affirmed; costs to neither party in this court.