Argued December 22, 1948; affirmed April 19; petition for
rehearing denied May 24, 1949

MURSENER *v.* FORTE ET AL. AND JACO ET AL.

205 P. 2d 568

*Stephen F. Chadwick,* of Seattle, and *Wilber Henderson,* of Portland, argued the cause and filed briefs for appellant.

*Oliver Crowther* and *Hugh L. Barzee,* of Portland, argued the cause for Receiver-Respondent and Intervenors-Respondents C. Jaco, et al. On the briefs were Morton & Crowther and Hugh L. Barzee, of Portland.

Before Rossman, Chief Justice*, and Lusk, Belt, Bailey, Brand and Hay, Justices.

---

* Chief Justice when this case was argued.

BELT, J.

Plaintiff O. W. Mursener, acting for and on behalf of the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, and Mt. Hood Lodge Local No. 72, acting through its Financial Secretary, Hugh L. Fagan, jointly and severally appeal from an order of the Circuit Court entered March 12, 1947, striking certain objections to the final report of the Receiver, appointed to take temporary custody and charge of the assets and business affairs of the local union. The parent labor organization has its headquarters at Kansas City, Kansas, and for the purpose of brevity will be hereinafter referred to as the International. Mursener is not a member of Mt. Hood Lodge Local No. 72, but is Vice President of the International. The subordinate lodge is located at Portland, Oregon, and will be referred to as Local No. 72.

The basic contention of the appellants is that the order of the Circuit Court appointing a receiver for this labor union is null and void in that the court had no jurisdiction of the subject matter or of the person. The Receiver was appointed on the petition of Melinda E. Murray, who, on December 18, 1943, filed a complaint in intervention, and on the petition of C. Jaco and Harold T. Poore, who, on December 31, 1943, filed an answer and cross complaint in intervention to the

original suit for injunction commenced by the plaintiff Mursener against Forte, et al, on November 22, 1943. Appellants assert that the suits in intervention were separate and independent proceedings injecting issues foreign to those alleged in the complaint in the injunction suit and, therefore, afford no basis for the appointment of a receiver. At the time these two suits in intervention were filed seeking the appointment of a receiver, there was pending for decision the case of *Duke v. Franklin, et al,* involving the same issues—but not the same parties—wherein Duke, among other things, prayed for a receivership. Appellants also contend that no jurisdiction was acquired over Local No. 72 for the reason that at the time of the appointment of the Receiver, the local union never appeared in court nor had any process been served upon it.

Assuming that the court had jurisdiction to appoint a receiver, appellants urge that it was an abuse of judicial discretion to do so under the facts and circumstances as disclosed by the record.

Appellants seek to surcharge the Receiver's account by reason of the following sums of money paid by the Receiver to attorneys for professional services rendered prior to the time of the appointment of the Receiver:

| Claimant | Amount Claimed | Amount Allowed |
|---|---|---|
| Tanner & Clark | $20,496.00 | $15,346.90 |
| Charles W. Robinson | 10,500.00 | 8,750.00 |
| Cookingham & Hanley and Maurice D. Sussman | 1,500.00 | 500.00 |
| Morton & Crowther and Hugh L. Barzee | 21,059.10 | 21,059.10 |

Appellants also seek to surcharge the Receiver—who filed a surety bond in the sum of $100,000—for the

following disbursements which, it is alleged, did not contribute to the preservation of the trust estate funds:

a. Money paid to Melinda E. Murray in settlement of suit pending against Local No. 72;

b. Sums paid to auditors;

c. Expenses paid to delegates to the National Convention;

d. Cost of a recount of ballots;

e. Costs incurred in prolonging the receivership and other miscellaneous expenditures.

This appeal involves consideration of one of the most voluminous records ever brought to this court. There are ten volumes of the transcript of evidence, aggregating 2,724 pages, a great part of which consists of colloquy between court and counsel. There are 143 exhibits, some of which contain more than one hundred pages. The briefs prepared by able counsel contain over six hundred pages and reflect a tremendous amount of work. The hearing on these objections to the final account of the Receiver commenced November 27, 1945, and ended February 18, 1946. The decision was not rendered until March 3, 1947. In this opinion no attempt will be made to recite the facts at length, but only so much thereof as is considered material to the issues.

Local No. 72 normally had approximately four hundred members; but when this country became involved in war and began its extensive ship-building operations in and about Portland, thousands of men were employed through the channels of this labor organization, and it rapidly became the largest and wealthiest labor organization in the world. Its growth was phenomenal and the dues paid by its 46,000 members—to say nothing of fines, assessments and initiatory fees—amounted

to millions of dollars. In fact, Local No. 72 had more money than it knew what to do with, and such was the real cause of its troubles. Various factions arose within the lodge, each eager and anxious to control and use these funds. There was the Tom Ray faction, the anti-Ray faction, the Jordan faction, and the International faction. The activities of Local No. 72 greatly expanded. It caused to be organized the Boilermakers' Building Association, a corporation, which acquired a building later known as the "Marble Palace." Almost two hundred thousand dollars was expended in remodeling and repairing the building. Its elaborate clubrooms and cocktail lounge attracted national attention. Eight thousand dollars was spent on the night of the "Grand Opening." The membership, however, was so large and unwieldy that the "rank-and-file" members never had the privilege of such luxurious facilities. The dues-paying members, however, were later compensated at a two-day picnic where $27,000 was spent, including the sum of $7,000 for beer. It became necessary to use a bulldozer to scrape out the bottles and glass that covered the bottom of "Bonnie Lure Lake." A professional football team was sponsored by the local union, resulting in a net loss of $22,261.07, as shown by the Receiver's report. A bowling alley, service station, and restaurant were also projects of the union. We appreciate that some of these matters have slight bearing on the issues, but at least are interesting side-lights in the history of Local No. 72.

Tom Ray, aided and abetted by J. A. Franklin, President of the International, became the "Czar" of Local No. 72. In 1941, he held the positions of Financial Secretary, Treasurer, and Business Agent, and, in violation of the Constitution and By-Laws of the order,

had the terms for such offices extended for a period of four years. He ruled with an iron hand. When the members in open meeting objected to his operations, they were promptly "squelched." When the opposition became too pronounced, the meeting was declared adjourned. On December 28, 1942, the anti-Ray faction held an election wherein new officers for Local No. 72 were selected. This election, however, was, at the request of Tom Ray, summarily held to be null and void by President Franklin of the International. There was no notice, charges or hearing. No other election during the past year had been held. President Franklin also, at the request of Tom Ray, on February 5, 1943, without notice, charges or hearing appointed a Governing Board consisting of twenty-one members to take over and have complete charge of the assets and business affairs of Local No. 72. Ray was one of the members of the Governing Board, and plaintiff O. W. Mursener was appointed by President Franklin to serve as chairman thereof. The Governing Board—not the members —selected new officers. Ray was retained in the offices previously held by him. It was two days after this appointment of the Governing Board that Russell W. Duke, a member of Local No. 72, filed suit against Franklin, et al, charging Ray with serious acts of maladministration as Business Agent of Local No. 72, alleging collusion between him and officers of the International, and seeking an accounting of funds alleged to have been misappropriated. This suit by Duke was the beginning of expensive and continuous litigation. There were fourteen suits pending at one time.

It was Ray who, in 1941, inaugurated the policy of issuing "work permits." After a ninety-day period at a cost of $1.00 per day, the person to whom the permit

was issued was eligible to make application for membership in the union. Later, the "work permit" period was changed to sixty days. There were two forms of permits issued—one official and the other non-official. The books account for the money derived from the issuance of official receipts, but there is no account of the thousands of non-official receipts issued. The receipt stubs were lost or destroyed. It is estimated that several hundred thousand dollars paid for the non-official receipts "disappeared." There was such a storm of protest over this iniquitous policy of issuing "work permits" that the International caused it to be abolished.

The action on the part of the International in thus appointing the Governing Board for Local No. 72 and depriving it of the right of self-government was the cause of much dissention. Charges and counter charges were the order of the day. Controversy between the various factions became so bitter that the Central Labor Council in Portland denied Local No. 72 the use of its hall for the purpose of holding meetings. It was rumored that large sums of money were being wrongfully and unlawfully appropriated. It was charged that Tom Ray, acting in collusion with President Franklin, was transmitting large sums of cash, government bonds and other securities to The Brotherhood State Bank of Kansas City, Kansas, and beyond the jurisdiction of the court. In fact, cash amounting to $344,081.03 and government bonds having a par value of $695,000 were transferred to such bank in Kansas—a bank owned and operated by officers of the International. Government bonds having a par value of $50,000 were sent to Kansas in violation of a specific order of the court enjoining the transferring of any funds of Local No. 72. Vice President Mursener of the International, in ex-

plaining why the funds were sent to Kansas, said, "There was rumors of the Coast being bombed." Large sums of money belonging to Local No. 72 were deposited in banks at Portland, Oregon, in the name of "International Executive C o u n c i l — International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, O. W. Mursener, Representative," notwithstanding the fact that the funds belonged to Local No. 72 and that the International had no interest therein.

On October 13, 1943, President Franklin dissolved the Governing Board on account of its alleged failure to carry out the labor policies of the International. At this time charges had been filed by the International against Tom Ray, and he was on his "way out." The cause of the break between Ray and Franklin is not clear. Members of the Governing Board refused to be ousted and still insisted on the right to function on behalf of Local No. 72. On November 18, 1943, O. W. Mursener, acting for and on behalf of the International, filed a suit against Tom Ray and obtained an order enjoining him from acting as a business agent or other officer of Local No. 72 and from interfering with Mursener "in controlling the financial and business affairs of said Local 72." After the Governing Board was dissolved, Mursener was appointed by the President of the International as an agent

> "to take full charge of the financial and business affairs of Local 72 and to continue with such power and functions during the pendency of the litigation heretofore instituted or that may be hereinafter instituted respecting the offices and affairs of Local 72 for the purpose of protecting and conserving the finances and other interest of the members of Local 72 and not otherwise."

After Mursener was thus appointed as agent of the International, he made demand upon certain officers purporting to act for Local No. 72 to permit him to assume and exercise control over the business affairs of the lodge, but they refused to do so. Thereupon, Mursener, acting for the International, instituted suit on November, 22, 1943, against defendants M. K. Forte and others, to enjoin them from acting as members of the Governing Board or in any other pretended official capacity and from interfering with the plaintiff as a representative of the International in controlling the financial and business affairs of Local No. 72. It was soon after this proceeding that the suits in intervention heretofore mentioned were filed. At this time the subordinate lodge was in a chaotic condition, and there was great uncertainty as to what officers were authorized to represent it. There was on deposit in the local banks funds aggregating $694,769.40. Numerous checks had been drawn by unauthorized officials, and the banks became involved in litigation by reason thereof. There was so much contention over the right to control this money that the United States National Bank, the First National Bank, and the Bank of California filed interpleader suits in the Federal Court for the purpose of having determined the interests of various claimants in these funds.

On December 22, 1943, a new Governing Board, consisting of seven members, was appointed by the International President, and Mursener was again selected to act as chairman. The second Governing Board—and not the members—elected four delegates from its own membership to the National Convention to be held at Kansas City, Missouri, on January 31, 1944.

■ On January 17, 1944, the court, Honorable Alfred

P. Dobson, Judge, presiding, after hearing, appointed Oscar Furuset as receiver of Local No. 72. In the order of appointment it is recited, among other things, that

> "During the course of the hearing all parties, save plaintiff, agreed in open court that receivership was the only solution of the difficulties of Local No. 72 and consented to the appointment of a receiver;
> "Said matters were heard from day to day to and including the 14th day of January, 1944, during which time facts were disclosed upon which the Court finds that intervenors are entitled to the appointment of a receiver and upon which the Court also finds that in any event it should upon its own motion in the best interests of all of the parties hereto and the members of Mt. Hood Lodge Local No. 72 appoint a receiver for said Local, with the power and authority and for the purposes in this order hereinafter set forth."

The hearing concerning the appointment of the Receiver was not reported, but it is presumed that the evidence is sufficient to support the recitals made by the court in its order of appointment. As stated in 45 Am. Jur., Receivers, 93, § 109:

> "The recital of jurisdictional facts in the order appointing a receiver is prima facie evidence of the existence of such facts. In other words, an order appointing a receiver is, in effect, a finding that all the facts necessary to authorize the appointment were established."

The Receiver was directed to assume full charge and control of the assets and business affairs of the local association. Such officer was also directed promptly to call a meeting of the members of the subordinate lodge for the purpose of electing delegates to the National Convention. At a meeting held under the supervision of

the Receiver on January 25, 1944, ninety-six members of Local No. 72 were nominated for election as delegates. Democracy was in action. Eleven delegates were elected. It is noteworthy that the four delegates chosen by the second Governing Board, who were also nominated at this meeting, were defeated. However, the Convention refused to seat the eleven delegates chosen by the members in accordance with the fundamental law of the association.

After Charles J. MacGowan was elected President of the International to succeed Franklin, he came to Portland for the purpose of settling the controversy between the International and the subordinate lodge and also of establishing peace with the various factions within it. Conferences were held, resulting in a written stipulation signed by MacGowan as President, Oscar Furuset as Receiver, Morton & Crowther and Barzee as attorneys for intervenors Jaco and Poore, and C. W. Robinson of attorneys for defendants. It was provided, among other things, that an election under the supervision of the Receiver would be held in "Lodge 72" on March 6, 7 and 8, 1944, for the purpose of selecting officers. Officers were elected and President MacGowan, in keeping with the stipulation, later installed them in office. It was further provided that all assets held by the International "for safe keeping" would be turned over to the duly elected officers. All interested parties agreed to "use their best efforts to promote peace and end pending litigation."

At this time substantial claims were pending against Local No. 72 for attorneys' services rendered prior to the appointment of the Receiver. President MacGowan, after a conference with Judge Dobson in which attorneys for all interested parties participated, recom-

mended that such claims—which he estimated amounted to $65,000—should be referred to a committee of three lawyers to be appointed by the President of the Multnomah County Bar Association to determine the liability of Local No. 72 therefor and, if liability existed, the reasonable value of such services. MacGowan at such conference agreed to abide by the finding of this committee and stated that he would recommend payment to the subordinate lodge in keeping with its findings. Attorneys for plaintiff Mursener also agreed to join in such recommendation of payment. Pursuant to such understanding and agreement, the various claims for attorneys' fees were submitted by the court to this Bar committee composed of three experienced and reputable lawyers, a procedure of which we do not approve as it is believed that the question of attorneys' fees was one for the court in the first instance to decide. The committee hearing on these claims extended for a period of twelve and one-half days. Several leading lawyers of Portland appeared before the committee and supported such claims for legal services. No evidence was offered to the contrary. After the committee made its report, President MacGowan and the attorneys for the plaintiff Mursener recommended to Local No. 72 that the claims be paid, but the union nevertheless refused to do so.

Amplifying the above statement of facts which, it is believed, is a sufficient factual background, see *Duke et al, v. Franklin et al,* 177 Or. 297, 162 P. (2d) 141, a suit for an accounting and to compel repayment of all sums belonging to Local No. 72 found to have been illegally expended. A decree awarding judgment against defendant Tom Ray for the sum of $10,000, paid to him by the Governing Board after it was dissolved, was

affirmed. *Mursener v. Redding,* 176 Or. 617, 160 P. (2d) 307, was an original proceeding in mandamus to compel the Honorable Charles W. Redding, Circuit Judge of the Fourth Judicial District of Oregon, to assign for trial the case of *O. W. Mursener v. M. K. Forte et al,* to some judge other than the Honorable Alfred P. Dobson, against whom the plaintiff had filed an affidavit of prejudice. The writ was denied. *M. K. Forte et al, v. Page,* 172 Or. 645, 143 P. (2d) 669, was an original proceeding in mandamus seeking to disqualify the Honorable E. M. Page, Circuit Judge, from acting in a case pending in the Circuit Court for Multnomah County, and to vacate a preliminary injunction issued by him therein. Writ was denied.

■ Before passing to the question of jurisdiction of the court to appoint a Receiver, it is well to consider the status or interest of appellants Mursener and Fagan. Do they have sufficient interest in these trust funds to entitle them to be heard in opposition to the Receiver's report? It is clear that Fagan, being a member of Local No. 72 is a party in interest and is entitled to be heard. But what about Mursener? He is not a member of Local No. 72 and is not a beneficiary of the trust. The International in the light of the record had no interest in the funds. Mursener certainly had no greater interest than his principal for whom he appeared. It is well settled that an exceptant to a receiver's final account must have some interest in the trust estate administered before he will be heard to complain. 2 Tardy, Smith on Receivers (2d ed.) § 610; 45 Am. Jur., Receivers, 272, § 337.

■ Whatever authority Mursener had was derived from the Governing Board appointed by President Franklin. Under Art. XV, § 7 of the Constitution and

By-Laws of Local No. 72, "the funds and property of a Subordinate Lodge are trust funds for the benefit of its members * * * *."

The International under its Constitution and By-Laws did not have the right to usurp the functions of Local No. 72 and to exercise dominion and control over these trust funds without giving the subordinate lodge notice and an opportunity to be heard on charges filed against it. We are not unmindful that Art. IV, § 1 of the Constitution and By-Laws of the International provides that the President

"shall have the direction and supervision of all Subordinate and District Lodges, with power to suspend their individual members or Lodges, when in his judgment it is for the best interest of our International Brotherhood."

In our opinion it is not contemplated by the above provision that the President is authorized arbitrarily or capriciously to "suspend a lodge" and thereby interfere with or jeopardize the interest of members who are beneficiaries of such trust funds. To hold otherwise would amount to a taking of property without due process. *Swaine v. Miller,* 72 Mo. App. 446; *Ellis v. American Federation of Labor et al,* 48 Cal. App. (2d) 440, 120 P. (2d) 79; *Taboada v. Sociedad Espanola De Beneficencia Mutua,* 191 Cal. 187, 215 P. 673, 27 A. L. R. 1508; *Gardner v. Newbert et al,* 74 Ind. App. 183, 128 N. E. 704; *Lundine v. McKinney,* (Tex. Civ. App ) 183 S. W. (2d) 265; *United Brotherhood of Carpenters and Joiners of America v. Carpenters Local Union No. 14 of United Brotherhood of Carpenters and Joiners of America,* (Tex. Civ. App.) 178 S. W. (2d) 558; 63 C. J., Trade Unions, 685, § 55; 10 C. J. S., Beneficial Associations, 293, § 50.

■ In the late case of *Washington Local Lodge No. 104 of the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America et al, v. International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America et al,* decided by the Supreme Court of Washington on February 21, 1949, and not yet published in the Pacific Reporter, the same International as involved herein was enjoined "from suspending or expelling any individual members of Local 104 as members without notice given, charges, and the opportunity to be heard." The court in a unanimous opinion, speaking through Mr. Justice ROBINSON, held that Art. IV, § 1 of the Constitution and By-Laws of the International violated the fundamental law of the land in that a member could thereby be deprived of his property without notice and an opportunity to be heard. We do not deem it to be necessary to go so far as to hold this provision of the International invalid, as we think it contemplates notice and hearing before a lodge can be suspended, notwithstanding that there is no specific provision therefor.

It is a fair inference from the evidence that President Franklin, in appointing the Governing Board, was not seeking to establish the autonomy of Local No. 72, but was acting with Tom Ray in endeavoring to dominate this subordinate lodge by controlling the use and disposition of its funds. President Franklin was not acting within the scope of the Constitution and By-Laws of the International, but in violation thereof when he deprived members of the right to hold meetings and to elect their own officers. The International continued in control of Local No. 72 approximately one year. Had a receiver not been

appointed, it is speculative as to how much longer it would have dominated the local association.

Appellants strongly rely on *Duke v. Franklin,* supra. In that case the authority of Franklin to appoint a Governing Board was not questioned or challenged. Certainly, Ray was in no position to do so. The issues involved in the Duke case are entirely different from those with which we are now concerned. While there is some language in *Duke v. Franklin,* supra, from which appellants may derive some comfort, we think the court is not thereby foreclosed from determining Franklin's authority to appoint the Governing Board.

■ Mursener is estopped from attacking the validity of the appointment of the Receiver since his principal, President MacGowan of the International, entered into a stipulation with such officer of the court, thereby recognizing his legal status. It will not do to contract with a receiver and then assert the non-existence of such officer. When the Receiver, under the order of the court, took Local No. 72 into his custody, the matter of which Mursener complained became as to him a moot question. In the mandamus proceeding of *Mursener v. Redding,* supra, this court, speaking through Mr. Justice Brand—after commenting upon the stipulation above mentioned and the effect thereof as a waiver—strongly questioned whether Mursener had the standing "to oust Judge Dobson by an affidavit of prejudice." The court, however, preferred to and did decide the case on other grounds.

Did the court have jurisdiction to appoint a receiver for this local labor union? Did it have the right to appoint a receiver at the instance and request of the intervenors, who were members of such labor union? Did the contractual relationship of the intervenors

with the union preclude them from obtaining such relief from a court of equity without first having exhausted their remedy within the union? How did the court, if at all, obtain jurisdiction over Local No. 72? These are the vital questions pertaining to jurisdiction.

■■ Equity had jurisdiction over the subject matter of the injunction suit brought by Mursener. The primary purpose and object of that suit was to determine who had the right of control over the funds and property of Local No. 72. The International, through its representative Mursener, was asserting such right. Intervenors by their answer and cross complaint sought to restore self-government in the subordinate lodge and to conserve and protect its trust funds, of which they were the beneficiaries. The pleadings reflect a basic contest between the International and Local No. 72 over the right to control the assets and business affairs of the order. The matter of which the intervenors complained was germane to the issues in the suit for injunction. We agree with the appellants that an independent controversy cannot be injected into a suit by intervention (*Brune v. McDonald,* 158 Or. 364, 75 P. (2d) 10) but in our opinion the suits in intervention are not of such character.

The jurisdiction of equity includes the ancillary remedy of receivership. *Muellhaupt v. Joseph A. Strowbridge Estate Co.,* 136 Or. 99, 298 P. 186; *Wm. H. Taylor Finance Corp. v. Oregon Logging & Timber Co.,* 116 Or. 440, 241 P. 388. Equity having assumed jurisdiction will give complete relief.

It is urged that the court had no jurisdiction to appoint a receiver because the intervenors were, by reason of their membership in Local No. 72, obliged to exhaust their remedies within the order before ap-

pealing to the courts for relief. Such undoubtedly is the general rule that courts will not interfere in the internal affairs of a voluntary association. A court of equity, however, in keeping with the exception to such general rule, will grant relief where the association, acting beyond the scope of its Constitution and By-Laws, violates the property rights of its members. In the light of the record in the instant case, it would have been a vain and idle procedure for the intervenors to have appealed to the International for redress of their grievances. In *Robinson v. Nick*, 235 Mo. App. 461, 136 S. W. (2d) 374—a case involving the appointment of a receiver for a labor union—the court said:

"It is indeed a well settled principle of law that in cases involving the internal affairs of an association such as a trade union, *where no distinct property right is directly involved,* a member who has a grievance must exhaust whatever remedies are provided within the organization before he may ask the courts to interfere. This for the reason that the relation between the member and the association is contractual; and so long as the constitution, rules, and by-laws of the association, which constitute the contract, do not contravene the laws of the land, and the affairs of the association are conducted fairly and honestly, the courts will refuse to interfere upon the theory that the decisions of the tribunals set up within the association are binding and conclusive upon the member. It is no less true, however, that where the association has not acted strictly within the scope of its powers; or where fraud, oppression, or bad faith is shown; or where it appears that an appeal within the organization would have been a vain and useless step, then the failure of the member to have availed himself of the remedies within the organization will not be a bar to his right to ask judicial interference." (Italics ours.)

*Webster v. Rankins*, (Mo. App.) 50 S. W. (2d) 746; *Collins v. International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators*, 119 N. J. Eq. 230, 182 Atl. 37; *Lundine v. McKinney*, supra; *McCantz v. Brotherhood of Painters, Decorators and Paperhangers of America*, (Tex. Civ. App.) 13 S. W. (2d) 902; *Washington Local Lodge No. 104 v. International Brotherhood of Boilermakers*, supra; 31 Am. Jur., Labor, 864, § 66, 10 C. J. S., Beneficial Associations, 311, § 65.

It is contended by appellants that at the time of intervention, there was another suit pending wherein a receivership was sought and that, by reason thereof, the court over which Judge Dobson presided had no authority to appoint the Receiver in question. It is true that there is no material difference between the basic issues in *Duke v. Franklin, et al*, supra, and those in the intervention suits; but the parties were not the same and therein lies the fallacy of appellants' contention. As stated in 1 C. J. S., Abatement and Revival, 62, § 39:

> "*Identity of parties*, causes of action, issues, and relief is necessary to the abatement of one of two actions by reason of the pendency of the other." (Italics ours.)

Also see *Muellhaupt v. Joseph A. Strowbridge Estate Co.*, supra; 1 Am. Jur., Abatement and Revival, 28, § 15.

Relative to the question of jurisdiction, it is urged that Local No. 72 was not in court and that the appointment of the Receiver is therefore void. This labor union is a voluntary unincorporated association. Obviously, it would be impractical to serve process on each of the 46,000 members of this union. The intervenors, as members of Local No. 72, instituted suit in

a representative capacity and appeared not only for themselves but for all other members of the union similarly situated. In 4 Am. Jur., Associations and Clubs, 487, § 49, it is stated:

"The doctrine of virtual representation, which recognizes the right of a few persons to sue or defend on behalf of themselves and all others similarly situated, has frequently been applied in the case of actions by or against voluntary unincorporated associations; and it is well settled that where the members of such an association are too numerous to be joined in the action, or where the society is composed of very many members, one or more of the members may sue on behalf of all the interested parties."

See note in 149 A. L. R. 510, listing numerous authorities supporting this elementary principle.

Having concluded that the court had jurisdiction of the subject matter and of Local No. 72, it follows that the order of appointment is not void. We come now to the question as to whether the court in appointing the Receiver did so in the exercise of its sound judicial discretion. Receivership is a harsh remedy and courts are very reluctant to resort to it and thus interfere in the internal affairs of such a voluntary association. It will do so only in extreme cases. Obviously, a court of equity cannot operate a labor union. Receivership of a labor union means that it cannot function, and its bargaining power is completely suspended during the time it is under the supervision of the courts. 27 Ore. L. Rev. 248; 46 Harv. L. Rev. 1037; 87 U. of Pa. L. Rev. 990; 7 St. John's L. Rev. 316; 42 Yale L. J. 1244. That courts are reluctant to interfere with the property and business affairs of labor unions is evidenced by the fact that

this is the first time in this state that a receiver has been appointed for such an organization. We think, however, that the court in the instant case did not abuse its discretion in taking temporary custody of Local No. 72. It acted primarily to restore self-government to the local union and to enable its members to elect its officers and otherwise enjoy rights guaranteed to them by the Constitution and By-Laws of the order. It is clear, in the light of the record, that trust funds were being dissipated and endangered, and dues-paying members were being exploited by a few unscrupulous labor officials. The lodge was undoubtedly in a chaotic condition. It was on the verge of complete disruption. Receivership appeared to be the only solution of the problem confronting the court.

The general objection to the Receiver's report on the ground that it is unintelligible and does not show receipts and disbursements is untenable. The books and accounts of Local No. 72 were audited by experienced Certified Public Accountants, and their report is incorporated in that of the Receiver. It is true that the Receiver's report is complex and quite confusing to a layman, but the testimony of the accountants in explaining the audit and the Receiver's report is that the receipts are properly shown and that there are vouchers and receipts for all expenditures. The objections to the report are in many instances trivial and, it seems to us, designed to harass and annoy the Court and its Receiver. Fagan objected to the item of $10,408.65, covering expenses of eleven delegates to the Kansas City Convention, but it is shown that as one of such delegates, he accepted his share of the funds appropriated for such purpose.

The Receiver is sought to be surcharged for a large sum of money, notwithstanding the fact that the

disbursements complained about were made pursuant to the order of the court. We have shown that the order of appointment is not void. A receiver is merely an officer or agent of the court appointed to administer the estate. Assuming the court had jurisdiction to appoint the Receiver, such officer, who acts in good faith, cannot be held personally liable for expenditures made by him pursuant to the order of the court. As stated in Alderson, Receivers, § 256:

"The liability of a receiver is either personal, when he must answer out of his own funds, or, official, when the judgment is to be satisfied out of the trust estate."

In 53 C. J., Receivers, 142, § 173, it is stated:

"So long as a receiver obeys the directions and instructions of the court having supervision and control of his administration of the receivership, his acts are the acts of the court."

45 Am. Jur., Receivers, 284, § 354, thus states the rule:

"No personal liability, as distinguished from official liability, of a receiver can exist where he disburses funds in his hands or does any other act by the order and according to the direction of the court; he will be protected in carrying out such instructions, and the court order under which he acts will be a complete defense to personal liability in any action or proceeding." Citing numerous authorities in support of the text.

1 Clark, Receivers (2d ed.) § 388, states:

"A receiver obeying the orders of the court is not a guarantor of the correctness of the court's rulings. Furthermore, when a receiver has paid out money or the fund in his hands in good faith and in obedience to the orders of the court appointing him, he can not be compelled to make restitution and he is not personally responsible."

■ When the court ordered payment of the attorney's fees, would the appellants have the Receiver refuse to comply with such order or contend that the fees were excessive? A good receiver obeys the order of the judge who appointed him.

■ The fee of $33,000 allowed to the Receiver is in a different category. The contention of appellant Fagan that the fee is excessive and unreasonable is properly here for consideration. Allowances to receivers are within the sound discretion of the court, subject, however, to appellate review. *Weber v. Empire Holding Corp.,* 149 Or. 503, 41 P. (2d) 1084; *Hyre v. Johnson,* 107 W. Va. 524, 149 S. E. 385, 64 A. L. R. 1536. As stated in 45 Am. Jur., Receivers, 223, § 287:

"The amount of allowance for costs and expenses, including compensation to the receiver and attorney fees, generally lies within the sound discretion of the court appointing the receiver, subject to appellate review, and the allowance made by the court is presumptively correct when questioned on appeal."

In determining whether the fee is excessive in this case it is proper for the court to take into consideration the value of the property and funds (approximately three million dollars) that came into the custody of the Receiver; the nature and character of the estate; the time, labor and skill required of the Receiver for the proper performance of his duties; and the benefits derived from such service. In view of the evidence strongly supporting the finding of the court relative to the fee of the Receiver, we cannot say that there has been an abuse of discretion in that regard.

The decree of the court dismissing the objections to the Final Report of the Receiver is affirmed. Respondents are entitled to costs and disbursements.