## James Jacobs, Administrator (Estate of Martin Marcus) *v.* Ringling Brothers-Barnum and Bailey Combined Shows, Inc.

Inglis, C. J., Baldwin, O'Sullivan, Wynne and Daly, Js.

Argued January 7—decided March 16, 1954

*Hugh M. Alcorn, Jr.,* with whom were *Louis E. Nassau* and, on the brief, *Henry P. Bakewell,* for the appellant-appellee (receiver Edward S. Rogin).

*Cyril Coleman,* with whom were *Dan G. Judge* and *John F. Reddy, Jr.,* both of the New York bar, for the appellant-appellee (defendant).

BALDWIN, J. The plaintiff, administrator of the estate of Martin Marcus, instituted an action for damages against the defendant circus, a Delaware corporation. Upon his application, Judge John H. King of the Superior Court appointed Edward S. Rogin receiver of the defendant. In the course of winding up the receivership, the Superior Court, upon the receiver's petition, made an order allowing him fees of $60,000. Both the defendant and the receiver have appealed from this order, the former claiming that the amount is too large and the latter that it is too small.

Certain facts are not in dispute. On July 6, 1944, the defendant was exhibiting its circus in Hartford. The main tent caught fire and was rapidly enveloped in flames. In the holocaust which ensued, 169 persons lost their lives and approximately 500 others were injured, some very seriously. The plaintiff in this action was one of the many who immediately brought suit and attached the properties of the circus. The claims for damages in these suits approximated $15,000,000. The properties under attachment were little more than an assortment of burned-out and nonoperative equipment and a collection of frightened and dangerous animals. The victims of the tragedy faced irreparable loss, the circus utter ruin. In spite of this black prospect, the bar of Hartford, co-operating with attorneys for the de-

fendant, devised a procedure whereby a receiver was appointed, the claims of the victims were arbitrated with a minimum of litigation and expense, and the circus went about its business, turning in its profits for the satisfaction of claims until, after a period of six years, the damages determined by the arbitrators were paid in full.

The decision of this case does not necessitate an exploration of and a report on the maze of infinite legal detail which had to be traversed to achieve so remarkable a result.[1] We pause in our consideration of the instant case to commend the handling of this whole affair as one of the finest examples of effective co-operation between lawyers, litigants and the trial courts in attaining justice that has come to our notice from the legal annals of this or any other state.

The specific issue presented by these appeals is whether the court erred in making an allowance of $60,000 to the receiver for his services. Incidental to it is the question of the real nature of the receivership. The defendant claims that the receiver was essentially a stakeholder—a receiving and disbursing agent—and that he seeks compensation for services which it was not necessary for him to perform. The receiver claims, on the other hand, that he was "a receiver in every sense of the word."

The finding, with such minor corrections as we find merited, may be briefly stated as follows: Edward S. Rogin was appointed temporary receiver upon the plaintiff's petition on July 12, 1944. The order directed that he "immediately . . . proceed to take possession of all the books, papers, evidences of debt and property of said corporation, to collect

---

[1] For a discussion of the legal aspects involved, see note, The Equity Receivership in Mass Tort, 60 Yale L.J. 1417.

all monies owing to it, and to take all lawful steps within his power to secure and preserve its assets."

An order was entered naming Rogin permanent receiver on September 15, 1944. He had been an active practicing attorney in Hartford for twelve years. He was considered an able, conscientious lawyer. Having posted the required bond, he took possession, on July 13, 1944, of such assets of the defendant as were then in Hartford. On that day, the attorneys representing the claimants met with counsel for the circus in the Hartford County courthouse. At this meeting, Dan Gordon Judge of New York, representing the circus, stated that it was the intention of the defendant and the Ringling family, who owned the controlling interest in it, to compensate all claimants, irrespective of any question of liability. He urged that the earning power of the circus be used for this purpose. As a result of this meeting, the president of the Hartford County bar, Lucius F. Robinson, Jr., appointed a circus disaster committee consisting of Robert P. Butler, chairman, Joseph P. Cooney and Julius B. Schatz, all members of the Hartford bar, who were to serve without compensation. There followed a series of conferences attended by the committee, counsel for the circus, and the receiver, with the result that the receiver applied to Judge King for authorization to accept from the defendant a bond or cash for $380,000 and an assignment of all its claims under its fire insurance policies in exchange for a release of the circus assets then in the receiver's hands. Judge King issued the order. The circus left Hartford for its home quarters in Sarasota, Florida, where it was reconditioned. It later went on the road again, playing in open stadia.

Several months after the beginning of the confer-

ences, a form of arbitration agreement was evolved. In essence, it was a private contract between each prospective claimant and the defendant. Although the defendant denied liability, it nevertheless agreed to compensate the claimants who would submit their claims to three arbitrators for a determination of the amount of damages in each case. The claims were to be paid out of the assets in the hands of the receiver and net earnings, as that term was defined in the agreement. The management of the circus was to continue in the hands of its officers. As the net earnings accumulated, they were to be turned over to the receiver, who was to distribute them under the order of the court. The defendant obligated itself not to become insolvent or reorganize under the Bankruptcy Act. All fees and expenses of the receiver and the receivership were to be paid by the defendant as ordered by the court. The receiver assisted actively in the preparation of this agreement. On February 9, 1945, the court approved it and authorized the receiver to proceed in accordance with its terms. The court specifically found that the "arbitration agreement was in no way a limitation upon the duties and responsibilities of the receiver. It was supplemental to such duties."

When the amount recoverable under the fire insurance policies assigned to the receiver yielded only $65,000 instead of $125,000, as had been expected, the receiver, having assisted in the adjustment of the loss, negotiated with the defendant for the payment to him, as receiver, of the $60,000 difference. He also participated in negotiating the settlement of a $500,000 disaster policy, carried with Lloyd's of London, which the defendant had agreed to turn over to the receiver, so that this amount was added to the sum in his hands available

for claimants. The defendant, after negotiations with the receiver, turned over to him tax rebates from the federal government in the amounts of $321,870.76 and $40,101.03. These sums were also added to the funds in the receiver's hands. During the receivership, a conflict over control of the defendant arose among its stockholders. The receiver was instrumental in preventing this conflict from disrupting the operation of the circus and keeping it off the road. If the circus had not continued to operate, recovery by the Hartford claimants would have been seriously jeopardized.

During the receivership, the receiver took part in innumerable conferences with representatives of the defendant, with members of the bar committee and with lawyers representing individual claimants. He worked some nights, Saturday afternoons and Sundays. He distributed nearly $4,000,000 to 549 judgment creditors in six separate dividend payments. These disbursements required correspondence with the claimants' attorneys, in some instances conferences with the claimants themselves, the preparation and recording of probate orders in the death claims, and satisfactions of all judgments. It took time to set up the necessary files and records and establish an office procedure to handle properly the correspondence, canceled checks, executed arbitration agreements, receipts of dividend payments, court orders and satisfactions of judgments.

The receiver was required to appear in court on many occasions, including ten appearances for the submission and approval of his accounts. He was required to resist a motion for the replacement of the receivership by a trusteeship. He examined thoroughly many documents forwarded to him by the defendant, including 121 weekly statements, and

the comparative and annual statements of Haskins and Sells, accountants appointed by the circus disaster committee under the arbitration agreement. The receiver caused an investigation to be made by the Pinkerton agency when it appeared that the gate receipts of the circus were falling off. His duties began on July 13, 1944, and continued until December, 1950. In the first months following his appointment, the task was time consuming and required a substantial amount of his professional service. During 1945, it continued to demand a generous portion of his effort. The years 1945 and 1946 were difficult periods for him because he was being pressed by distressed claimants and at the same time was working with the circus management to forestall the ever-present danger of forced liquidation. From 1947 on, the work was not so demanding. The order of the court contemplated a true, though a limited receivership. The arbitration agreement imposed upon the receiver, as an officer of the court, the added duty of seeing to it that its terms were faithfully observed. This involved time, thought, ingenuity, imagination and effort.

We have considered it necessary to catalogue only in a general way the principal tasks undertaken and completed by the receiver. The minutiae are contained in a finding of seventy-seven paragraphs and in an exhibit, containing day-by-day notations of activities, which covers fifty-two pages of the printed record. On the basis of this exhibit, the receiver claimed substantially 2000 hours of time spent on the receivership. In addition, he claimed some 3000 hours of which no written record was made. The court found, however, that 2000 hours fairly measure the time that was reasonably necessary for the administration of the receivership. The receiver

served without benefit of legal counsel until October 27, 1944. He has not heretofore asked for or received any allowance for his services. Upon these facts, the court made an allowance of $60,000.

The finding warrants the conclusion that the receiver was not a mere stakeholder and that the services rendered by him in addition to receiving and disbursing funds turned over by the defendant were necessary. His responsibility and duty involved much more than a careful, detailed disbursement of funds and an accurate and complete accounting. True, he was not required to operate the circus or to liquidate it. He was, however, faced at the outset with the difficult problem of finding some way of meeting, out of the liquidated assets within the jurisdiction of this state, the demands of many claimants. He assisted in the formulation and execution of procedures to accomplish this purpose. It cannot be gainsaid that the circus disaster committee and the attorneys for the defendant worked faithfully and well to achieve a truly remarkable result. They were compensated, in the one case, out of fees from claims which they represented against the receiver, and, in the other, out of fees from the defendant. The counsel and advice of these men was of great value to the court. However, the court looked to the receiver as its officer. Upon him rested the heavy burden of responsibility. Because the court had authorized him to proceed in accordance with the terms of the arbitration agreement, it became his duty as receiver to see that the defendant kept that agreement and that it continued in operation profitably so that the net profits and other money paid to it would increase the funds in his hands available for distribution. The trial court was warranted in finding that all of the services for

which it made an allowance were reasonably necessary for the performance of Rogin's duty as receiver. Rogin was faced with the necessity of making sound decisions and reliable recommendations. A lack of diligence and comprehension on his part could well have been fatal to the entire program. He had to acquire knowledge about the business of the defendant, its financial operations and its management policies and problems as well as about the personalities directing its affairs with whom he had to deal. This required industry, integrity, skill and tact. His competence was recognized during the receivership by both the court and counsel for the defendant.

In the absence of a statute, there is no established rule of thumb for determining the amount of a receiver's fees. They must be fixed at an amount that will be reasonable and fair compensation for the services rendered. What is a reasonable amount is a question of fact. High, Receivers (4th Ed.) § 783; 1 Clark, Receivers (2d Ed.) p. 880; Beach, Receivers (2d Ed.) p. 833, § 769; 45 Am. Jur. 224, § 288; 75 C.J.S. 1063; *In re Standard Gas & Electric Co.,* 106 F.2d 215, 216; see *Finn* v. *Childs Co.,* 181 F.2d 431, 435. The value of the services cannot be computed with mathematical certainty. *Newton* v. *Consolidated Gas Co.,* 259 U.S. 101, 105, 42 S. Ct. 438, 66 L. Ed. 844. The burden is upon the applicant to prove their worth. *Woods* v. *City National Bank & Trust Co.,* 312 U.S. 262, 268, 61 S. Ct. 493, 85 L. Ed. 820. Certain recognized factors enter into the determination. Consideration should be given to the nature, extent and value of the property administered. *Mursener* v. *Forte,* 186 Ore. 253, 278, 205 P.2d 568; *In re New Jersey Refrigerating Co.,* 106 N.J. Eq. 526, 528, 151 A. 445; *W. & W. Cor-*

*poration* v. *Feil,* 101 Fla. 1091, 1096, 134 So. 57; *Edwards* v. *United Food Brokers, Inc.,* 196 Ga. 241, 250, 26 S.E.2d 348. The complications and difficulties encountered should be noted. *Hudson* v. *Hubbell,* 171 Okla. 201, 202, 41 P.2d 844. The responsibilities involved, and assumed by the receiver, and the diligence and thoroughness which he displays are weighty elements. *Pitts* v. *Walker,* 212 Ala. 645, 647, 103 So. 850; *Harrigan* v. *Gilchrist,* 121 Wis. 127, 435, 99 N.W. 909. The knowledge, experience, labor and skill required of the receiver and devoted by him to the receivership must be taken into account. *Hudson* v. *Hubbell,* supra; *Edwards* v. *United Food Brokers, Inc.,* supra. Then, too, the time properly required to be spent is an important consideration. *Dee* v. *United Exchange Building, Inc.,* 88 F.2d 372, 374. The amount paid as compensation for similar services should also be regarded. *Harrigan* v. *Gilchrist,* supra. The trial court was not in error in its conclusion that a true receivership, but for limited purposes, was created by the court and that the receiver was not a mere stakeholder. The court properly took into consideration the essential elements involved in fixing the receiver's fees. We cannot say that the sum allowed was more, nor that it was less, than reasonable compensation for Rogin's services as receiver. This view of the case disposes of both appeals.

The defendant assigned error in two rulings on the admission of evidence. These were not pressed in brief or argument and are therefore considered as abandoned. *Freund* v. *Burns,* 131 Conn. 380, 386, 40 A.2d 754.

There is no error on either appeal.

In this opinion the other judges concurred.