BERNARD H. MATTHIES ET AL. *v.* RAYMOND E. HACKETT ET AL., TRUSTEES (ESTATES OF GEORGE E. MATTHIES ET AL.), ET AL.
(two cases)

SUPERIOR COURT   NEW HAVEN COUNTY   FILE NOS. 89504, 89506
AT NEW HAVEN

Memoranda filed August 12 and October 10, 1960 [1]

---

[1] See footnote, p. 468 supra.

*Leo V. Gaffney,* of New Britain, *John P. Hodgson,* of Hartford, and *Robert M. FitzGerald,* of Litchfield, for plaintiffs Bernard H. Matthies and Richard L. Matthies in each case.

*William H. Timbers,* of Darien, for Raymond E. Hackett, Earl B. Boies, and H. George Carroll, appellees-trustees in each case.

*Pullman, Comley, Bradley & Reeves,* of Bridgeport, for all plaintiffs (appellants) in each case.

*Goldstein & Peck,* of Bridgeport, for Katharine Matthies, beneficiary under the trust of the late Annie W. Matthies in each case.

*Cummings & Lockwood,* of Stamford, for defendants Raymond E. Hackett, Earl B. Boies and H. George Carroll in each case.

### PRELIMINARY MEMORANDUM

COTTER, J. The above actions are appeals from decrees of the Probate Court for the district of Derby allowing the defendant trustees' accounts for the year 1957. The items in controversy in the accounts concern fees approved by the Probate Court charged by the defendant trustees for services rendered to the trusts and for attorneys' fees of Cummings and Lockwood for the services of that firm to the trusts. The plaintiffs are Bernard H. Matthies, one of the two life beneficiaries of the two trusts, and his son, Richard. Four other remaindermen, children of Bernard, did not join in the appeals. Miss Katharine Matthies, the other life beneficiary, approved and approves of the fees charged, allowed and approved by the Probate Court.

The Superior Court herein acts "as an appellate court of probate" which "as an appellate court" is "incompetent to award damages" and "the jurisdic-

tion of probate courts over testamentary trusts is purely statutory." *Phillips* v. *Moeller,* 147 Conn. 482, 486, 487.

The Superior Court cannot exercise a primary jurisdiction reposed in the Probate Court. *Reiley* v. *Healey,* 122 Conn. 64. That case states (p. 79): "Ordinarily, where a Court of Probate has refused to allow an account as a whole and an appeal has been taken, the Superior Court may, so far as it can without exercising a power vested exclusively in the Court of Probate, proceed to settle the account. . . . But the Superior Court cannot exercise a discretion vested in the Court of Probate; it can only review the exercise of the discretion to determine whether it has been reasonably and legally exercised. *Carroll* v. *Arnold,* 107 Conn. 535, 542. . . . The Superior Court cannot exercise a primary jurisdiction which by the statute is reposed in the Court of Probate." In that first *Reiley* case, the Supreme Court said (p. 80): "[T]he trial court might no doubt, if it found adequate reason, have settled the account so far as it could properly do so and, with a statement of principles of law applicable, left to the Court of Probate the question of the allowance or disallowance of credit for the amount paid by the administratrix to herself by way of allowance." The second *Reiley* case, *Reiley* v. *Healey,* 124 Conn. 216, further speaks out about the jurisdiction of the Superior Court and at page 220, in connection with the power of the Superior Court relevant to settling the account, states: "Whether it should do this is a matter within its discretion, ordinarily reviewable only to determine whether that discretion has been reasonably exercised." Likewise, in the second *Reiley* case, the Supreme Court bemoaned the extensive litigation but nevertheles stated (p. 221) that the "underlying fact" was "whether the administratrix exercised

due diligence and prudence in administering the estate, a question which the Superior Court could determine as well as could the Court of Probate." Then it further stated: "[I]f the Superior Court could not determine the question whether the entire amount of the allowance made to the administratrix . . . should be credited to her, it could settle the account except for this item and remand the matter to the Court of Probate with appropriate directions for its decision as to it." This indicates that the Superior Court could only determine a credit or debit or disallowance but not the amount involved. Then the court goes on to state (p. 222): "Where an executor or administrator presents an account, the burden is upon him to prove the facts involved in it, and if he fails of proof as to any issue, it must be found against him; if he fails to justify the allowance of claimed credits they must be disallowed." All of this further indicates that the jurisdiction of the Superior Court in appeals from probate is severely limited. *First National Bank & Trust Co.* v. *McCoy,* 124 Conn. 111, 115.

It would appear then that the Superior Court cannot fix the fees even though there is dicta suggesting ways of expediting this type of case. It is primarily the function of the probate courts, and the Superior Court can only review their discretion. *Richey* v. *First National Bank & Trust Co.,* 123 Conn. 360, 362; *Peck* v. *Searle,* 117 Conn. 573, 583; *Carroll* v. *Arnold,* 107 Conn. 535, 542. Judge O'Sullivan, in *Carll's Appeal,* 12 Conn. Sup. 394, followed the same reasoning, determining that the Superior Court could not fix the compensation of an executor, that it could only determine whether or not the Probate Court abused its discretion. The Superior Court fixed what it felt were reasonable fees in *Hayward* v. *Plant,* 98 Conn. 374, but it is indicated in the record of that case, in the memorandum of

decision, that the trial court "was requested by all of the parties, under an agreement," to fix the fees that were in controversy. 245 Rec. & Briefs 25. Similarly, the record of *Stevenson* v. *Moeller,* 112 Conn. 491, would indicate to the same effect. 389 Rec. & Briefs 1433. In *Bohun* v. *Kinasz,* 124 Conn. 543, 548, the Supreme Court disapproved the practice of the Superior Court in allowing an amount for attorneys' fees and stated that it was "a matter primarily in the discretion of the Court of Probate and this item should not be included in the account as stated and allowed by the Superior Court," citing both the *Reiley* cases, supra. It would seem, then, that the Superior Court is limited to crediting or debiting items in the accounts.

The fees charged and allowed to each trustee for both estates amounted to $17,000 each. The fees of Cummings and Lockwood for services rendered to the trustees amounted to $16,000, making a total of $67,000 charged and allowed for fees which are presently in controversy. The trustees had interests, by virtue of their position, in five other companies from which Cummings and Lockwood received fees as follows: $20,000 from Seymour Manufacturing Company; $15,000 from American Refractories and Crucible Company; $2500 from Phosphor Bronze Corporation; $2500 from Batiscan Company; $3000 from Seymour Products Company. Thus, a total of $43,000 was received for attorneys' fees in 1957 from companies in which the trustees or the trusts had an interest. The trustees were also directors of various companies for which they received fees, namely, $1200 from Seymour Manufacturing Company for services as directors of the company in 1957; the trustees Carroll and Boies received directors' fees of $40 from American Refractories and Crucible Company for directors' meetings attended by them; Boies received a salary

of $1200 to $1500 from Seymour Products Company for his services as a director and vice president of that company in 1957; $7500 from Batiscan Company for services rendered over a period of six years.

The trustees claim that the estates have had a value of $5,764,616.65 in the estate of George E. Matthies and $2,698,353.75 in the estate of Annie W. Matthies. George E. Matthies died in 1922, leaving a will in which the trusts were set up, and Annie W. Matthies, his wife, died in 1939, leaving a will in which the trusts were set up. Earl B. Boies has been a trustee since 1934 in the case of George Matthies' estate and since 1939 in the case of Annie Matthies' estate. Both Hackett and Carroll have acted as trustees under both estates since 1950.

A great deal of evidence was admitted in connection with the claims of the appellants as to bad faith, personal profit, fraud and matters relating to the management and running of the various corporations in which the trusts had an interest. Likewise, a great deal of evidence was admitted as to the great and varied interests which Franklin Starr Jerome had in many other companies during the time he was a trustee of both trusts. However, in view of the recent case of *Phillips* v. *Moeller,* 147 Conn. 482, it is the decision of the court that it cannot determine any matters outside the scope of the appeals from probate, as other matters would seem to concern an equity jurisdiction unless it can be shown that those matters directly involve and concern the activities of the trustees during 1957. The court takes the view that it must be concerned with the reasonableness of fees in the 1957 accounts and only with matters which directly concern the quality and quantity of services rendered during that year by the trustees. Since under such a view of the cases the court is concerned with whether or not the

fees charged, allowed or credited were reasonable, it must apply the test and standards set up in the series of cases decided by our Supreme Court, especially *Hayward* v. *Plant,* supra, as restated in *Stevenson* v. *Moeller,* supra, which are in many respects similar to those of a receiver. *Jacobs* v. *Ringling Bros.-Barnum & Bailey Combined Shows, Inc.,* 141 Conn. 86, 94.

There was a great deal of testimony and evidence as to the work done, time spent, responsibilities involved and decisions which were made. Likewise, experts testified as to the value to be placed upon the services rendered both by the trustees and by the attorneys. The trial began February 16, 1960, and continued through June 8, 1960, except for one week when Judge Devlin, at the request of the parties, conferred with some ten lawyers and others in an effort to negotiate the settlement of these appeals together with numerous other cases which were then pending and many of which are still pending in the courts. During this time the court tried other matters, and after negotiations fell down, it proceeded with the trial of these cases. Thereafter, the court heard arguments for a period of two days on July 21 and July 22, and extensive briefs and proposed findings of facts were filed.

In view of the decision which the court has made and takes at this time, it would probably appear better not to discuss in detail all of the facts involved or find such facts until after a suggested meeting with counsel and a filing of this preliminary memorandum of decision has been made, so that the parties may have an opportunity to consider the suggestion which the court is about to make. At this time the court does not feel that it is feasible to discuss many of the matters which have been fully and bitterly litigated, for instance, concerning the

services of Terry and the subsequent termination of his employment, affairs concerned with the Batiscan Company, matters concerned with the so-called scrap reports, matters concerning the Jerome estate and interests, and others, until after counsel have had an opportunity to consider this decision.

As to the standards and tests to be applied to the reasonableness of attorneys' fees, one can find them set forth in detail in canon 12 of the canons of professional ethics. Practice Book, p. 4. In that connection, it is stated that the client's ability to pay cannot justify a charge in excess of the value of the service, and six criteria are set as follows for determination of what is a fair and reasonable fee: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client.

Under all the circumstances, the court feels that the fees charged are unreasonable but that it cannot itself set an amount. Therefore, rather than send the accounts back to the Probate Court for the correction of these items, where an extensive trial might be anticipated, the court suggests that counsel and the parties stipulate or agree that the

court may fix fees that it feels are reasonable under all of the circumstances, and in the event of dissatisfaction with such amounts the parties may take an appeal to the Supreme Court. After the extensive litigation which has taken place, it would seem unfortunate if the appeals were sent back to the Probate Court for further long and extended trial and then have an appeal taken again to the Superior Court and eventually or ultimately to the Supreme Court of Errors. This is all the more unfortunate because there are pending many cases in many appeals, and there will be additional accounts filed in the years 1958 and on until the trusts are terminated. The court therefore files this preliminary memorandum of decision and suggests that all counsel meet with the court on August 15, 1960, at 2 p.m., at which time counsel are asked to indicate their position in regard to a stipulation or agreement as suggested by the court.

### MEMORANDUM OF DECISION

COTTER, J. The preliminary memorandum of decision dated August 12, 1960, in the above entitled cases is hereby made a part of this decision. It decided that the fees charged as therein discussed were unreasonable. Thereafter, after two meetings with counsel for all concerned, a stipulation dated August 18, 1960, was entered into, in effect agreeing to empower the court to decide what it believed to be reasonable fees. The court proceeded to review the evidence preparatory to writing a further opinion in that connection. In the course of such an effort, however, it received a communication from Attorney Timbers dated August 27, 1960, which is made a part of this memorandum, to the effect that while two accounts were filed in 1957, presumably as to only two trusts, in reality there were five trusts created. Although the trial lasted from February 16 through June 22 and briefs, proposed

findings of fact and several conferences were held thereafter with the court, the matters contained in the Timbers' letter of August 27 were never raised with the court until the receipt of the letter. Since that was the case, the court wished additional time to consider any authorities involved in this claimed new issue and in conversations with Attorneys Timbers, Hodgson and Goldstein suggested a stipulation by counsel to allow the filing of a decision after September 16, 1960, because of a possible questioning of the statute permitting the same, to which counsel at the time seemed to agree. This stipulation was finally received on September 14.

Since the question as to five separate trusts was not heretofore raised, the court will decide the issue in accordance with the practice followed in the George E. Matthies estate since 1922 and the Annie W. Matthies estate since 1939 and treat the accounts as they have been always filed, as an annual account in the estate of each testator. It is conceivable that some other proceeding may be initiated hereafter to revise the newly discovered methods advocated.

There is no need to reiterate the rule as to reasonable fees to be charged by a trustee and the elements to be considered as enunciated in *Hayward* v. *Plant,* 98 Conn. 374, 384, and *Stevenson* v. *Moeller,* 112 Conn. 491, and other cases. Earl B. Boies, an employee and officer of the Seymour Trust Company, was appointed a trustee on June 28, 1934, under the George E. Matthies will and has acted as such under the Annie W. Matthies will since 1939. He receives and has received a salary from the bank since 1921 as a full-time employee and likewise has acted during the time of the trusts as a director and officer of several corporations, for which he likewise was paid. H. George Carroll and Raymond E. Hackett, both lawyers, became trustees under

both wills on January 25, 1950. Charles D. Lockwood, a former partner of Hackett, was an earlier trustee, and Hackett, through Lockwood and their firm, representing the trusts since their inception, was exceedingly familiar with the workings and business of the trusts and estates. Carroll, likewise, through his New York law firm and a former legal associate had much experience along the same lines. As a result of these associations and experiences, the work to be done was nothing new or novel to the trustees.

The routine of the business of the trustees had been established by the practice of many years. Consequently, the trusts, although having assets in the millions, did not require the whole time or even a major portion of the time of such trustees to properly handle their business needs. While the estates were large and required considerable responsibilities, the investments were common to both trusts and required very little change in the portfolio and required, in many instances, the exercise of rights which went along with the holding of securities and other duties of management as routine practices. Of course, the wills set up the number of trustees and permitted the holding of certain assets. The testators had the right to designate three trustees rather than one and probably with good reason, although one capable trustee could adequately administer each trust, but they might have had in mind the knowledge, skill and judgment of several. However, it would appear that the trustees did employ unnecessary time in many respects and duplicated their services to some extent.

It is claimed by the plaintiffs that the trustees are not entitled to any compensation because of their attitude toward certain beneficiaries, their

failure to pursue the Jerome matters in 1957, their handling of matters involving Terry, certain decisions on scrap reports and their handling of insurance matters for the Seymour Manufacturing Company. They likewise insist that the trustees acted improperly as to the Batiscan matter, the French franc question, Wentworth's retirement, Raeburn's dismissal and entries as to payment of fees to Mr. Alcorn. The court does not agree with plaintiffs wholeheartedly on all of these. Many of these matters cannot be considered, in view of the recent holding in *Phillips* v. *Moeller,* 147 Conn. 482. This indicates that the case at bar is an appeal from probate and not an equity proceeding, that our jurisdiction is limited to the matters directly concerned in the accounts for the year 1957. However, the court interprets that to mean it can consider matters outside those involved particularly with the 1957 dealings, if the questions brought up are directly relevant and material to 1957.

The court does not feel that at this time it can specifically enter into all the Jerome dealings, as they were revealed in evidence, in considering the matters of 1957. Those dealings present an awesome spectacle. It is difficult to see how the trustees, at the time and thereafter, could have permitted the transactions which came out in evidence to go on and take place over such a period of time without the most thorough inquiry and the highest sense of responsibility. When the Jerome transactions came to light after Jerome's death, the then trustees and their representatives began to take action, but it remains to be seen whether they acted in a prudent way in performing all that was to be done in preserving the trust estates. At one time the court felt that they had done so, but in retrospect the pattern of dealing by Jerome was so obvious and consistent that a considerable amount of research,

time and effort was certainly necessary and required to ferret out all the questionable practices in an effort to live up to the responsibilities accepted by the trustees when they assumed their trusteeships. One of the circumstances of mitigation in this regard is the unwavering faith and implicit confidence Bernard H. Matthies, the chief beneficiary of the trusts, reposed in Jerome. Jerome used hundreds of thousands of dollars of such assets in furthering his own speculative endeavors. He was in many real estate ventures controlling corporations financed with such assets, which, of course, however, he did return to some extent before his death. He had interests in Union Estates Corporation, Varick Building Corporation, Varick Corporation, 205 West 69th St. Corporation, 571 West 182nd St. Corporation, Bulwark Corporation, New York Postal Service Station Inc., Newpostal Service Corporation, and Northeast Corner 34th St. and 11th Ave., Inc. In addition, of course, he was in the Seymour Bank and Trust Company and handled the interests of the various companies in which the trusts were concerned. All of these matters present serious questions and responsibilities which the trustees must consider.

From all the evidence presented as to the insurance placement and coverage, it appears that Terry acted in a reasonable manner and that his questioning of the audit of Batiscan and the French franc transaction was properly one with which he should be concerned. Naturally, the plant should be adequately covered in the event of casualty, and an involvement in tax situations is disturbing. Likewise, the reports and meetings as to the scrap investigation were handled in such a way that Richard Matthies was not treated in a manner to incite serious consideration and respect. The scrap situation should have concerned the trustees and

management, and no summary dismissal in the way in which T. Mark Keefe did so was such thoughtful, serious consideration as that which should have been followed. A matter of this nature, brought to the attention of those responsible, should be treated in a serious, businesslike way, with the proper remedies pursued to counteract any future occurrence.

Many of these situations, such as Wentworth's retirement, Raeburn's dismissal and others, of course, are questions of management which in the instant case the court does not feel it should explore except to the extent they affect the reflected duties, responsibilities and work of the trustees in regard to reasonable fees. It should be borne in mind also that they as directors were paid to manage the company, and many of these matters were concerned with such an office. As A. Fuller Leeds, senior trust officer and vice president of the City Trust Company of Bridgeport, testified, such problems had to do with being on the board of directors and they were essentially problems of directors. Conceivably, if the trustees did not like to get into these difficulties in the management of Seymour Manufacturing Company and others, they could designate other directors who would handle this travail at the usual director's fee. It would seem at this point in the litigation that the question as to a Batiscan audit and the French franc transaction should be treated as closed, since the United States government has not indicated any interest in these affairs, and likewise the listing of the Alcorn fee is of no moment, since it has been now charged and paid directly by the beneficiary. It was fully known and disclosed to all the beneficiaries, and no one concerned suffered any possible loss as it was originally entered. In fact, Katharine Matthies, who approved it and designated that it be

so set up, was the one directly concerned and she was perfectly satisfied and still is.

Several experts testified as to reasonable fees, and as is usual their testimony varies considerably. Thurston Greene stated that $25,000 for each trustee and $20,000 for Cummings and Lockwood was reasonable. William Gumbart set $16,000 to $20,000 for Cummings and Lockwood, and Benjamin Blackford gave $17,000 for each trustee; Curtiss K. Thompson testified it should be from $17,000 to $19,000; A. Fuller Leeds said $9000 for each trustee was reasonable; and Richard L. Welden testified that Earl Boies should receive $7000, George Carroll $7000 and Raymond Hackett $4000 for their services as trustees.

In regard to counsel fees, it must be noted, as set forth in the preliminary memorandum, that Cummings and Lockwood received $43,000 in attorneys' fees in 1957 from companies in which the trustees or trusts were interested, so that many of the matters involved similar situations, research, work and experience. There appears to have been a certain unnecessary duplication of work in many transactions. Clearly, if the assets of the trusts and companies were less, the time spent in all these dealings would have been cut down and the time and effort more efficiently and expeditiously used, with equally reasonable results.

Upon all the evidence, the court finds that fair and reasonable fees charged should have been as follows for the year 1957, in lieu of a total of $17,000 each:

Earl B. Boies     $11,000
     $4000 in the Annie W. Matthies Estate
     7000 in the George E. Matthies Estate

H. George Carroll                  $11,000
    $4000 in the Annie W. Matthies Estate
    7000 in the George E. Matthies Estate

Raymond E. Hackett              $10,500
    $4000 in the Annie W. Matthies Estate
    6500 in the George E. Matthies Estate

And the court finds that the reasonable fees charged to the trustees in both trusts by Cummings and Lockwood should be $10,000, in lieu of $16,000, having in mind the sharing of Hackett, which is questioned, and that Cummings and Lockwood has already received $20,000 from Seymour Manufacturing Company.

The court realizes that the year 1957 was a turbulent one and that a crisis in the events of the companies and trusts arose frequently, but it would seem that conciliatory efforts upon the part of the trustees and others could have avoided many of the contests and controversies and reduced the time, effort and consequent expense involved. The court is mindful that a pattern may be set in future years but does not intend this to be so. The problems, difficulties and performances will undoubtedly vary, and the court has attempted to appraise the overall picture without regard to the rancor and bitterness which had been engendered and allowed to fester to the detriment of all concerned. All these matters and other litigation should be amicably settled to the enormous advantage of everyone and to save the extreme expense that has gone on and will exist in the future unless all matters are negotiated and peacefully settled.

Let judgments in form be drawn up in accord with these views, reversing the decrees of the Probate Court by reason only of the excessive fees allowed to the trustees and to their counsel thereunder, with costs to the appellants; and directing

the clerk of this court to transmit to the Probate Court a certified copy of said judgments.

Judgments may be entered modifying the orders and decrees of the Probate Court, as provided for herein.